CITY COUNCIL OF BOSTON & another *vs.* CITY OF BOSTON
& others.[1]

Suffolk. January 7, 1982. — May 7, 1982.

Present: HENNESSEY, C.J., ABRAMS, LYNCH, & O'CONNOR, JJ.

*Municipal Corporations*, Municipal finance, Officers and employees.
*Boston*.

A plan whereby the mayor of Boston, following refusal by the city council
    to create and fund five new departments of city government proposed
    by him, in effect created each of the departments, assigned it functions
    substantially as proposed to the city council, and attached it for fund-
    ing purposes to an existing department, and under which plan the new
    departments would be funded by debiting the appropriations of other
    city departments to which they provided services, violated city charter
    provisions contained in St. 1909, c. 486, § 3B, as appearing in
    St. 1941, c. 604, § 1, and amended by St. 1954, c. 24, requiring that
    transfers of appropriated funds be approved by two thirds of the
    members of the city council.  [181-184]
A series of contracts between the city of Boston and the Boston Redevelop-
    ment Authority providing payment for the services of named individu-
    als who were to be transferred to the authority from employment in
    city departments, where the city council had included no funds for the
    functions covered by the contracts in the appropriations for the de-
    partments concerned, violated city charter provisions contained in
    St. 1909, c. 486, § 3B, as appearing in  St. 1941, c. 604, § 1, and
    amended by St. 1954, c. 24, requiring that transfers of appropriated
    funds be approved by two thirds of the members of the city council.
    [184-185]
Boston city charter provisions contained in St. 1909, c. 486, § 3B, as ap-
    pearing in St. 1941, c. 604, § 1, and amended by St. 1954, c. 24,
    while permitting certain reimbursements among municipal depart-
    ments without city council approval, require that money appropriated
    for a department's needs be expended to fund the functions for which
    the appropriation was made.  [185-186]

---

[1] The other defendants are the mayor of Boston and the collector-treas-
urer and the auditor of Boston.

CIVIL ACTION commenced in the Superior Court Department on December 17, 1980.

The case was heard by *Garrity*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Harold J. Carroll*, Corporation Counsel, for the defendants.

*Eric W. Wodlinger* for the plaintiffs.

LYNCH, J.   This is a ten-taxpayer action for declaratory and injunctive relief brought by those who were at the time the nine city councillors of Boston, in their official capacities and individually, together with a tenth resident of Boston.  See G. L. c. 214, § 1; G. L. c. 231A, § 1; and G. L. c. 40, § 53.  The plaintiffs allege that certain transactions between city departments constitute transfers of appropriations in violation of a provision of the city charter[2] requiring that such transfers be approved by two thirds of the city council.  After the plaintiffs' two applications for preliminary injunctive relief were denied by two different judges of the Superior Court, the case was advanced for speedy trial and was tried in February of 1981 by a third Superior Court judge.  On March 5, 1981, the trial judge ruled that the challenged transactions violated the city charter and permanently enjoined the defendants from making further trans-

---

[2] Statute 1909, c. 486, § 3B, as appearing in St. 1941, c. 604, § 1, and amended by St. 1954, c. 24, provides as follows:  "After an appropriation of money has been duly made by the city of Boston for any specific purpose, or for the needs and expenditures of any city department or county office, no transfer of any part of the money thus appropriated shall be made except in accordance with and after the written recommendation of the mayor to the city council, approved by a yea and nay vote of two thirds of all the members of the city council; provided, that the city auditor, with the approval in each instance of the mayor, may make transfers, other than for personal service, from any item to any other item within the appropriations for a department, division of a department or county office.  After December tenth in each year the city auditor may, with the approval of the mayor in each instance, apply any income and taxes not disposed of and make transfers from any appropriation to any other appropriation for the purpose only of closing the accounts of the fiscal year."

fers of appropriations without the approval of two thirds of the council.

On March 13, 1981, the plaintiffs filed a motion for a preliminary injunction to prevent the defendants from paying certain sums of money from various departmental appropriations to the Boston Redevelopment Authority (BRA). The plaintiffs alleged that these payments would violate the permanent injunction which had been entered against the defendants. On March 18, 1981, the trial judge made written findings of fact and rulings of law in which he described the proposed payments as "obviously an effort to circumvent the requirements of the March 5, 1981 permanent injunction." However, he found it unnecessary to issue a new permanent injunction or to reissue the March 5 injunction because the city could be expected to "recognize the limitations on its authority and . . . conform to them," quoting from *Anderson* v. *Boston*, 376 Mass. 178, 200 (1978).

The defendants then sought a stay of the March 5, 1981, injunction from a single justice of this court. The single justice agreed with the defendants that the judge's rulings presented substantial questions of interpretation but declined to issue a stay on the ground that the questions should be handled initially by the judge who heard the case. Final judgment was then entered against the defendants in the Superior Court, and the defendants appealed. We transferred the case to this court on our own motion, and we now affirm the judgment.[3]

1. *Introduction.*

At issue in this case is the meaning of St. 1909, c. 486, § 3B, as appearing in St. 1941, c. 604, § 1, set out in full at note 2, *supra,* and its application to the transactions described be-

---

[3] The plaintiffs originally appealed from the denial of their second motion for a preliminary injunction. By order of this court, the plaintiffs' appeal was transferred from the Appeals Court and consolidated with the defendants' appeal from the entry of the permanent injunction. The parties have agreed that the legal issues raised by the two appeals are identical and that the plaintiffs' appeal has been effectively mooted. We therefore order the separate appeal of the plaintiffs to be dismissed.

low.  Section 3B provides, in relevant part, that "[a]fter an appropriation of money has been duly made by the city of Boston for any specific purpose, or for the needs and expenditures of any city department . . . , no transfer of any part of the money thus appropriated shall be made except in accordance with and after the written recommendation of the mayor to the city council, approved by a . . . vote of two thirds of all the members of the city council . . . ."  We begin our analysis by reviewing in some detail the transactions which gave rise to this action.  The relevant facts are drawn from the findings of the trial judge and from certain exhibits introduced at trial.  The defendants have not challenged any of the judge's findings on appeal.

2.  *Factual Background.*

a.  *Events prior to entry of March 5, 1981, permanent injunction.*  Pursuant to St. 1909, c. 486, § 3, as appearing in St. 1941, c. 604, § 1, the defendant mayor of Boston submitted to the city council a proposed operating budget for Boston for the fiscal year beginning July 1, 1980 (the program budget).  In this document the mayor recommended to the city council specific appropriations for all city departments and divisions of departments.  The recommendations were quite detailed.  For each department and each "program" within that department the total amount requested was broken down into categories such as "personal services," "contractual services," and "supplies and materials."  The program budget also contained a "summary of personal services" for each program, indicating the total number of positions recommended by the mayor and the total amount recommended to fund those positions.

The mayor's program budget included recommended appropriations for five new departments:  the Energy Office, the Mayor's Office of Policy Development, the Office of Public Safety, the Mayor's Office of Communications, and Boards and Commissions.  The mayor also submitted to the council proposed ordinances to create these new depart-

ments.[4]  The city council appropriated no funds for the five new departments in its July 30, 1980, appropriation order for fiscal year 1980-1981 and, in August of 1980, the council rejected the mayor's proposal for ordinances creating the departments.

A group of city department heads met several times after July, 1980, to discuss the council's action on the proposed new departments.  In the words of the judge, "a consensus was reached that, because of their importance to the Mayor and their merit, the policies and programs implicit in the operations of the [five new] entities . . . , although neither created as departments or divisions of departments nor funded by appropriations, should nevertheless be carried out under the aegis of other existing City departments and divisions of such departments which carried out similar and analogous policies and programs."  Direct funding for the operation of these programs within existing departments, through requests for additional or supplementary appropriations to the council, was not sought.  An assessment was made that it was unlikely that such requests would be granted.  At least by July 1, 1980, and possibly earlier, there were groups of city employees working within existing departments as separate entities with the names of the proposed new departments and the functions which had been proposed for those new departments.

The judge made extensive findings on the administrative and fiscal structure supporting the operation of the five entities.  Each entity was assigned to a "host department" in the following manner:  the Energy Office and the Mayor's Office of Policy Development were hosted by the Office of Public Facilities; the Office of Public Safety and the Mayor's Office of Communications were hosted by the Office of Public Service (a division of the mayor's office); and Boards and Commissions was hosted by the Community Services

---

[4] Under St. 1909, c. 486, § 5, as appearing in St. 1953, c. 473, § 1, the city council, "with the approval of the mayor," may make by-laws or ordinances to create a new department.

Administration (also a division of the mayor's office). Despite the formal presence of the "hosted entities" within existing city departments, the staff of each entity was supervised by its own director and not by the head of the host department. Each hosted entity operated with its own "budget" or spending limit and performed the same services which had been described in the proposals to create the entity as a new department with its own appropriation.

In his 1980-1981 program budget the mayor had recommended substantial increases in the personnel appropriations for the three offices which eventually functioned as host entities. The amounts actually appropriated by the council for personnel in these offices, while they represented increases over the 1979-1980 appropriations, were significantly lower than the appropriations which the mayor had sought.

The theory behind the funding mechanism for the five hosted entities was simple: the hosted entities would provide services to other city departments; the appropriations of these departments would be debited for the cost of these services; and these amounts would then be credited to the appropriations of the host departments.

The heads of the departments to which services were provided agreed in advance, in writing, to debit their appropriations on a quarterly basis by specified amounts to cover expenses which would be incurred by hosted entities and which would be charged initially to the appropriation accounts of the host departments. Thus the appropriations of the departments receiving services were "encumbered" or set aside to fund the policies and programs being pursued by the hosted entities. The defendant auditor would (and did) approve a "debit transfer" if the department receiving the services of a hosted entity "accepted the charges therefor as proper and relevant to his or her department or division and if the documentation therefor was clearly reasonable."

The "debit transfer" system outlined above differs significantly from the use of debit transfers in fiscal years prior to 1980-1981. First, debit transfers were previously used for

specific itemized services and served to balance accounts be-
tween departments at the end of a fiscal year. For example,
an appropriate amount would be debited from the appro-
priation of the city elections department and credited to the
school department to reimburse the latter for its operation
of polling places during an election. In 1980-1981, a new
type of debit transfer appeared. It consisted, in the judge's
words, of "the transfers of substantial amounts of money
from line departments, most notably Police, Fire, and
Health and Hospitals to administrative departments for the
purpose of keeping certain administrative functions alive
when the City Council had rejected ordinances creating
City departments . . . to perform such functions and had
refused to fund them." Second, in 1980-1981, the debit
transfers were planned in advance. The third difference is
that prior to 1980-1981 debit transfers were used in conjunc-
tion with requests to the council for transfers of appropria-
tions under St. 1909, c. 486, § 3B. The supervisor of bud-
gets for Boston, who had prepared requests for transfers in
each of the six years prior to 1980-1981, estimated that re-
quests had been submitted to the council at the rate of about
five a year and testified that, to the best of his knowledge,
the council had never rejected such a request. By contrast,
as of mid-December, 1980 (half-way into the fiscal year),
no requests for transfers of appropriated funds had been
submitted to the council.

b. *Events following entry of March 5, 1981, permanent
injunction.* In a memorandum dated March 15, 1981, the
director of the BRA outlined an agreement for certain "con-
tracts" between the BRA and four departments of the city of
Boston. The four departments (health and hospitals, public
works, police, and fire) were to pay the BRA a total of
$598,000 over the period from March 18 through June 30,
1981, "to complete various detailed planning studies to im-
prove functional as well as management systems of the in-
dividual departments." To perform the services, the BRA
was to take on, as temporary employees, sixty-one named
individuals. Forty-four of these individuals had been work-

ing in the Mayor's Office of Policy Development and the Energy Office, the two entities hosted by the Office of Public Facilities, and nine had been working in the Office of Public Safety, the entity hosted by the Office of Public Service. The memorandum further represented that each of the departments had "approved the scope of services and the amount of funds to be paid" to the BRA and that the Public Facilities Commission had "delegated" to the BRA "the responsibility to carry out these tasks on behalf of the several city departments."

3. *Discussion.*

a. *Relevant provisions of city charter.* The legality of the debit transfer system outlined above depends on the allocation of power between the mayor and the council made by the city charter. We focus specifically on the appropriation process, keeping in mind that "the scheme or framework of government is to be ascertained from all the provisions of the charter." *City Council of Boston* v. *Mayor of Boston*, 383 Mass. 716, 719 (1981), quoting from *Fiske* v. *Worcester*, 219 Mass. 428, 429 (1914).

We had occasion only last year to observe that Boston's form of city government is the "Plan A" or "strong mayor" type. *City Council of Boston* v. *Mayor of Boston, supra.* Under the city charter all executive powers of the city are "vested in the mayor, to be exercised through the several officers and boards of the city in their respective departments, under his general supervision and control." St. 1885, c. 266, § 6. The mayor appoints department or agency heads "without confirmation by the city council," St. 1909, c. 486, § 9, and St. 1909, c. 486, § 5, as appearing in St. 1953, c. 473, § 1, and may remove a department head by filing a written statement of reasons with the city clerk. St. 1909, c. 486, § 14, as amended by St. 1966, c. 642, § 11. The various department heads are accountable to the mayor, "as the chief executive officer," for the performance of their duties, and the mayor is charged with "secur[ing] the honest, efficient and economical conduct of the entire executive and administrative business of the city, and the

harmonious and concerted action of the different departments." St. 1885, c. 266, § 6. Furthermore, the charter expressly bars the city council and its members from "directly or indirectly . . . tak[ing] part in . . . the conduct of the executive or administrative business of the city." St. 1948, c. 452, § 17G, as appearing in St. 1951, c. 376, § 1. The council does have the power, however, with the mayor's approval, to pass by-laws or ordinances to create new departments or agencies in the city. St. 1909, c. 486, § 5.

While the day-to-day operation of city government is largely left to the mayor by the city charter, the city council plays an important role in the annual appropriation process. Under the charter, "[a]ll appropriations . . . shall originate with the mayor, who . . . shall submit to the city council the annual budget of the current expenses of the city . . . for the current fiscal year . . . ." St. 1909, c. 486, § 3. The council has no power to originate a budget. City department heads are required to submit to the mayor, "in such detail as he may require," estimates of the expenditures their departments will make in the next year, and the mayor, in turn, is required to transmit these estimates to the council. *Id.* The city council "may reduce or reject any item" but may not increase or add an item. *Id.* The council must "take definite action on the annual budget by adopting, reducing or rejecting it" by a specified date. *Id.* The council's appropriation order must then be presented to the mayor who may "approve some of the items in whole or in part and disapprove other of the items in whole or in part." St. 1948, c. 452, § 17D, as appearing in St. 1951, c. 376, § 1. The mayor's veto of any part of an appropriation order renders it void and, unlike vetoes of other types of council action, may not be overridden by the council. *Id.*

There are two means by which changes may be made in the city's annual budget once it has been passed by the council and approved by the mayor. First, the mayor may submit to the council supplementary appropriation orders. St. 1909, c. 486, § 3. Second, the mayor may recommend the transfer of an amount already appropriated. St. 1909,

c. 486, § 3B. It is this second provision of the charter which is at issue in this case and we therefore discuss it in some detail.

The basic rule established by § 3B is that "[a]fter an appropriation of money has been duly made by the city of Boston for any specific purpose, or for the needs and expenditures of any city department . . ., no transfer of any part of the money thus appropriated shall be made except in accordance with and after the written recommendation of the mayor to the city council, approved by a yea and nay vote of two thirds of all the members of the city council . . . ." This rule is qualified in two respects. The city auditor, with the mayor's approval, "may make transfers, other than for personal service, from any item to any other item within the appropriations for a department [or] division of a department." St. 1909, c. 486, § 3B. Furthermore, after June tenth[5] in any year the city auditor, again with the mayor's approval, may "make transfers from any appropriation to any other appropriation for the purpose only of closing the accounts of the fiscal year." *Id.*

The legislative history of § 3B sheds some light on the meaning of "transfers" for which the approval of two thirds of the council is required. Prior to 1941, the mayor had virtually unlimited power, between November fifteenth and January first (i.e., during the last one and one-half months of the fiscal year), to approve transfers by the auditor "from any appropriation to any other appropriation." St. 1909, c. 486, § 3, as amended by St. 1924, c. 479, § 2. In 1939, a special commission was created to investigate the budget and appropriating procedure of the city of Boston. In 1941, the commission issued a report together with a draft of the statute which was subsequently enacted as St. 1941, c. 604. In its 1941 report to the Legislature, the commission pointed

---

[5] Section 3B actually reads "December tenth." By St. 1969, c. 849, § 63, a fiscal year running from July first through June thirtieth was adopted for all cities of the Commonwealth "notwithstanding the provisions of their respective charters." Thus the reference to "December tenth" in § 3B should now be read as "June tenth."

out that "[t]he value of a budget can be largely defeated by a lax procedure as to transfers of appropriations," and concluded that "transfers which make a substantial change in appropriations should be made only with the sanction of the city council." 1941 House Doc. No. 2807, at 7-8.

b. *Validity of debit transfer system under charter.* The plaintiffs argue that the debit transfer system adopted by the defendants effects transfers of appropriations for which council approval is required under § 3B. They stress that the challenged system enabled the defendants to fund programs which had been rejected by the council during its budget deliberations, thus undermining the council's role in the appropriating process.

The defendants, on the other hand, contend that the challenged transactions were expenditures of appropriations, not transfers. They portray the debit transfer system as simply a method of charging the appropriation of one department for services provided to it by another city department.

We conclude that, at least to the extent it was used to maintain the five hosted entities, the debit transfer system violated § 3B and encroached impermissibly on powers reserved to the council under the city charter.

We recognize that "[t]he city council's authority is limited largely to a check on the mayor's executive function through the power of appropriation." *City Council of Boston* v. *Mayor of Boston, supra* at 720. Furthermore, even in the appropriation process, the council's power is limited. It may not appropriate money except upon the recommendation of the mayor, and its appropriation orders are subject to disapproval by the mayor. Significantly, though, once the council has exercised its power to reject an item in the budget recommended by the mayor, that action is final. In this case the council rejected the mayor's recommended appropriations for the five new departments which became "hosted entities." The mayor's use of a debit transfer system to establish and fund these departments despite the council's decision makes the council's power of rejection meaningless.

The hosted entity scheme thwarts the appropriation process in a second way. When the council appropriated specific sums for the "needs and expenditures" of the various city departments, it presumably relied on the mayor's representations, expressed in the program budget he had submitted to the council, that certain amounts would be required to carry on the work of those departments. In a letter to the council which accompanied the program budget the mayor described his figures as "firm, steady budgets which reflect the actual needs of city departments at full service." Thus, when the council appropriated a sum of money for the police department, it was with the understanding that this amount was required for the work of that department. By the same token, when it rejected the sum recommended by the mayor for the new "Energy Office," it was with the expectation that that amount of money would not be available for those purposes. By instituting a debit transfer system after the appropriation process was completed, the mayor was changing the assumptions on which the council had acted. The practical effect was to rewrite the program budget so that less money was available for line functions, such as those performed by the police and fire departments, than was intended by the council.

We think it clear that these transfers represent the kind of "substantial change in appropriations" which, under § 3B, must be approved by two thirds of the council. The defendants concede that § 3B was "designed to insure that budgetary priorities established by the city council are not changed without the [council's] concurrence," but they argue that these "priorities" should be viewed expansively. In the defendants' view, for example, when the council "appropriates" money for the police department, the department head is free to spend that money in any way he chooses, so long as the expenditures are within the "general mandate" of the department. It is true, as the defendants point out, that the council appropriates money to a department in broad categories such as personal services, contractual services, and supplies and materials. It is also true that under

§ 3B the city auditor has broad power, with the approval of the mayor, to "make transfers, other than for personal service, from any item to any other item within the appropriations for a department," and that under St. 1948, c. 452, § 17G, the council may not take part in "the expenditure of public money."

The defendants' characterization of these transactions as "expenditures" rather than "transfers" of appropriated money, however, is unavailing. The departments whose appropriations were "charged" to support the activities of the hosted entities could hardly expend money they did not have. The mayor had requested the council to approve separate appropriations for what became the five hosted entities. The council rejected these requests. The defendants then devised a system by means of which these same entities would be funded with money which had been appropriated for the needs of other departments. Under this system, the effect of budget cuts made by the council was negated by the simple expedient of funding the rejected programs through the appropriations of other departments to which those programs arguably were relevant. These were not "expenditures" of money which the paying departments had available. They were transfers to the rejected programs of sums that had been represented to the council as necessary for other work of the paying departments.

The validity of the challenged transactions under the charter does not hinge on whether the hosted entities actually performed services or whether the services were within the scope of the paying departments' functions. The trial judge did characterize the services provided by the hosted entities as "of a vague and general nature, most often involving public relations, [and] of little or no, and certainly no more than indirect, benefit to the department receiving and paying for the services," but neither his decision nor ours depends on this characterization. The question is simply whether payments for the hosted entities' services are unapproved transfers of appropriations under § 3B. We hold that, under the circumstances, these payments do ef-

fect substantial changes in the appropriations approved by the council and therefore constitute transfers of appropriations.

Although the council's arguments focus primarily on the appropriation process, it is also clear that the hosted entity scheme was a means of circumventing the refusal of the council to create new city departments. The defendants describe the hosted entity/debit transfer system as an effort "to centralize certain functions administratively." They argue, for example, that the Energy Office (the entity hosted by the Office of Public Facilities), with its expertise in the area of "energy conservation," can handle energy issues for other city departments more efficiently than would be possible if each department handled these matters itself. In the context of this case these arguments seem to suggest that the mayor may create new city departments without council approval. The hosted entities here functioned independently of the host departments except to the extent that their expenses were charged initially to the appropriations of the host departments. They had their own directors and their own "budgets." The projected expenditures of three of the hosted entities were roughly the same as the appropriations the mayor had recommended for the entities when they were proposed as new departments. In the case of the two entities hosted by the Office of Public Facilities, the projected expenditures of one entity were much higher than the amount initially sought as an appropriation, while those of the other entity were significantly lower. Overall, the hosted entities functioned in substantially the same manner as they would have if they had been created as departments. This type of "administrative centralization" ignores the procedure established by the charter for the creation of new departments.

c. *Validity of contracts with the BRA.* We agree with the trial judge that the defendants cannot save the hosted entity system by recasting it as a series of contracts between the BRA and city departments. The defendants repeat their assertion that mere "expenditures" of appropriations by city

departments do not require council approval. They also point out that the BRA is not a city department. In the Superior Court the defendants apparently argued that, since the BRA is not a city department, it is not subject to § 3B. Section 3B is not expressly limited to transfers of appropriations between city departments, and our reading of it does not support such a limitation. A transfer occurs whenever appropriated funds are spent for a purpose or on an object for which no money was appropriated. The council appropriated no funds for the functions covered by the BRA "contracts," either by a specific appropriation or, by implication, in the appropriations for the various city departments. Expenditures for these functions therefore constitute transfers of monies appropriated for other purposes.

In any event, as the plaintiffs point out, these "contracts" run afoul of the provisions of the charter which regulate the awarding of contracts by the city for amounts in excess of $2,000. City of Boston Code, Statutes, Title 4, §§ 5-8 (1975). Section 5 requires, inter alia, that bids for such contracts be invited by advertisement unless the person authorized to enter into the contract on behalf of the city furnishes a written statement giving reasons for not inviting bids and the mayor gives his written authority to dispense with bidding. There is no suggestion that this procedure was followed here.

d. *Scope of Superior Court judge's orders.* Our discussion thus far has focused on the role of debit transfers in the hosted entity system. This use of debit transfers was new in 1980-1981 and, as we have explained, amounts under the circumstances to an invalid system of transfers of appropriations. The plaintiffs alleged in their complaint that the defendants intended to make illegal transfers amounting to approximately seven million dollars. The defendants admit in their brief to this court that, "[i]n fiscal year 1981, the City administration planned in advance to use [debit transfers] to the extent of about seven million dollars to centralize certain functions administratively." It seems agreed, however, that the city has also continued to

use debit transfers as it has traditionally, i.e., when one department performs services for another and is reimbursed for its work. For example, as already noted, the elections department appropriation might be debited to reimburse the school department for its operation of polling places. We do not read § 3B as prohibiting debit transfers of this sort.

Section 3B requires city council approval only for transfers which make a substantial change in appropriations. When the council refuses to appropriate money for a particular function and refuses to approve creation of a new department to pursue that function, and money from other appropriations is later used for this very purpose, a substantial change in appropriations has been made. On the other hand, when, for example, the council appropriates money for the elections department and one of the tasks of that department is the operation of polling places, it can be assumed that the council's appropriation includes money for that purpose and no substantial change in appropriations occurs if expenditures for that purpose include reimbursements to another city department for operating polling places. Section 3B does not forbid all interdepartmental cooperation that requires the expenditure of money. It merely requires that money appropriated by the council for a department's needs be expended to fund the functions for which the appropriation was approved.

As the single justice recognized, portions of the Superior Court judge's orders could be read to prohibit all bookkeeping transfers between departments or to require city council approval of all disbursements of money from one department to another department or to an outside contractor. When the orders are read in their entirety, though, it is clear that this is not what was intended.

We affirm the judgment of the Superior Court granting the plaintiffs' request for a permanent injunction against the defendants. The plaintiffs' appeal from the denial of the second motion for a preliminary injunction is dismissed.

*So ordered.*