Boston Licensing Board *vs.* City of Boston & another.[1]

Suffolk. April 12, 1983. — October 21, 1983.

Present: Grant, Kaplan, & Warner, JJ.

*Statute,* Construction. *Boston. Boston Licensing Board. Municipal Corporations,* Budget, Finance.

By St. 1906, c. 291, the city of Boston is required to appropriate funds for the expenses of the Boston Licensing Board in the amount requested by the board. [13-20]

Requests made by the Boston Licensing Board for payment of its expenses by the city of Boston are not subject to the budget and appropriation provisions of St. 1909, c. 486, § 3. [20-21]

Civil action commenced in the Superior Court Department on June 1, 1981.

The case was heard by *Hallisey,* J., on motion for summary judgment.

*Jacqueline Lillard Allen,* Assistant Corporation Counsel, for the defendants.

*Thomas G. Shapiro* for the plaintiff.

Warner, J. The defendant city of Boston (city) appeals from the entry in the Superior Court of summary judgment for the plaintiff, Boston Licensing Board (licensing board). The licensing board's complaint requests injunctive and declaratory relief to require the city to appropriate the funds which the board determined were necessary to pay its expenses. At issue is the proper construction of the special statute which created the licensing board, St. 1906, c. 291, particularly the provisions of §§ 2 and 3, pertaining to the financing of the licensing board. There is no dispute concerning any material fact. Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974).

---

[1] Mayor of the city of Boston.

At least since 1956, the licensing board has submitted annual budgets to the mayor of the city which have been funded by appropriations made by the city council, following recommendations of the mayor, in accordance with statutory appropriations procedures.[2] See St. 1909, c. 486, § 3, as amended through St. 1974, c. 276, § 53. In February of 1981 the licensing board approved a budget for the 1982 fiscal year in the amount of $247,035. The licensing board then submitted a budget request in this amount to the city, calling it a "budget requisition . . . in accordance with the procedure outlined in Chapter 291 of the acts of 1906 as amended." In response, the mayor first advised the licensing board that he would recommend to the city council an appropriation of $124,000.[3] The mayor's final recommendation, made after this action was filed, was for an appropriation of $239,000. In April of 1981, the city advised the licensing board (and all city departments) that no further expenditures (other than for utility expenses) would be approved during the 1981 fiscal year "unless of an emergency nature" and with prior written approval.

Summary judgment was entered which declared: "The [licensing board] may employ such clerk stenographers [sic],

---

[2] In each year since 1956, the mayor has recommended an amount lower than that requested by the licensing board in its budget. In all but one of those years (in which a supplemental appropriation was involved), the city council appropriated an amount lower than that requested by the licensing board. In five of those years the licensing board's expenditures were slightly in excess of appropriations and in all other years expenditures were less than appropriations. The city does not have records for years prior to 1956.

[3] The mayor's recommendation included a figure of $64,570 for personal services, an amount less than that necessary, $85,000, to pay the salaries set by the statute then in effect, St. 1906, c. 291, § 2, as appearing in St. 1975, c. 413, § 1, for the statutory positions of the three members and the secretary. St. 1906, c. 291, § 1. Further, if this recommendation had been adopted by the city council, the licensing board would have had no funds with which to pay administrative and clerical help which the licensing board is authorized to employ. St. 1906, c. 291, § 3.

office employees and legal assistance[4] as it may deem necessary; the expenses therefor and all incidental expenses incurred by the board in the performance of its duties and the exercise of its powers shall be paid by said city upon requisition of the board. Such requisition need not be submitted as a part of a budget to the mayor, but shall be paid by the city without further review or change."

The licensing board argues that this declaration is dictated by the provisions of St. 1906, c. 291, § 1, which provides in part that "[t]he governor, with the advice and consent of the council, shall appoint from the two principal political parties three citizens of Boston . . . who shall constitute a licensing board for said city. . . . One member of said board shall be designated by the governor as chairman." The requirement that the three appointments be made "with the advice and consent of the council" was repealed by St. 1964, c. 740. *Opinion of the Justices*, 374 Mass. 864, 868 (1978). Statute 1906, c. 291, § 1, as so altered by St. 1964, c. 740, also gives the Governor the power to remove any licensing board member "for such cause as he shall deem sufficient."

Section 2 of the 1906 act, as appearing in St. 1975, c. 413,[5] sets the salaries of the three members of the licensing board and its secretary and states: "Such salaries shall be paid in monthly instalments by the city of Boston." Section 3 of the 1906 act, which has not been amended, provides that the "board may employ such clerks, stenographers and office employees, and such legal assistance, as it may deem necessary, and the expense thereof and all incidental expenses incurred by the board in the performance of its duties and the exercise of its powers shall be paid by said city upon requisition of the board."[6]

---

[4] On appeal the city does not challenge the judgment insofar as it relates to payments for legal services.

[5] An amendment by St. 1983, c. 78, § 1, increased the salaries.

[6] Section 4, as amended by St. 1915, c. 313, § 1, which is not at issue, provides in part that "all fees for [all] licenses [issued by the licensing

The city argues that all appropriations for the licensing board are subject to St. 1909, c. 486, § 3, which originally and as amended[7] provides that "[a]ll appropriations to be met from taxes, revenue or any source other than loans, shall originate with the mayor."[8]

1. "We begin our analysis with the general rule that 'a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.'" *Registrar of Motor Vehicles* v. *Board of Appeal on Motor Vehicle Liab. Policies & Bonds*, 382 Mass.

---

board], including recording fees, miscellaneous fees and all other revenue, shall be paid into the treasury of [the] city." See *Colonial Tavern, Inc.* v. *Boston Licensing Bd.*, 384 Mass. 372, 376 (1981).

[7] Amendments, e.g., by St. 1941, c. 604, § 1, St. 1966, c. 642, § 10, St. 1974, c. 276, § 53, and most recently by St. 1982, c. 190, § 15, did not alter the provisions of relevance here.

[8] Several cases have held that the licensing board is a department of the city for some purposes but a part or an agency of the Commonwealth for other purposes. See *Saxon Coffee Shop, Inc.* v. *Boston Licensing Bd.*, 380 Mass. 919, 923 n.3 (1980). Compare *Opinion of the Justices*, 374 Mass. 864, 867-868 (1978) (licensing board is a part of the "executive department" of the Commonwealth for the purpose of determining the Governor's power of appointment), with *Colonial Tavern, Inc.* v. *Boston Licensing Bd.*, 384 Mass. 372, 374-376 (1981) (licensing board acted as a local board and not as a State agency for the purpose of determining its liability to a licensee). Compare also *Police Commr. of Boston* v. *Boston*, 343 Mass. 480, 483-484 (1962) (police commissioner [appointed by the Governor] is subject to a provision in the city charter requiring advertising for bids, notwithstanding St. 1906, c. 291, § 8 [which contained provisions much like those in issue in this case]), with *Police Commr. of Boston* v. *Boston*, 239 Mass. 401, 407, 409 (1921) (Statute 1906, c. 291, § 8, gives the police commissioner the authority to require the city to provide accommodations as determined by the commissioner). These cases do not settle the precise issue before us. See also *Prince* v. *Boston*, 148 Mass. 285, 288-289 (1889), discussed below; *McGinnis* v. *Medway*, 176 Mass. 67, 68 (1900); *Cook* v. *Springfield*, 184 Mass. 247, 248-249 (1903); *Trustees of the Pub. Library of Boston* v. *Rector of Trinity Church*, 263 Mass. 173, 179-180 (1928); *McDonald* v. *Superior Court*, 299 Mass. 321, 324 (1938).

580, 585 (1981), quoting from *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513 (1975). In so construing a statute, we may examine it "in connection with [its] development, [its] progression through the legislative body, the history of the times, prior legislation . . . and in the light of the Constitution and of the common law." *Commonwealth* v. *Welosky*, 276 Mass. 398, 401 (1931).

We look first to the language of St. 1906, c. 291, §§ 2 & 3: "Such salaries *shall* be paid . . . by the city," and the board's expenses "*shall* be paid by said city upon *requisition* of the board" (emphasis supplied). The motion judge considered this language to be "clear and unambiguous." "The word 'shall' is ordinarily interpreted as having a mandatory or imperative obligation." *Hashimi* v. *Kalil*, 388 Mass. 607, 609 (1983). In its context, the use of "shall" in the 1906 act indicates that the Legislature intended to prevent the exercise of discretion on the city's part. See *Bloom* v. *Worcester*, 363 Mass. 136, 156 n.15 (1973). Ordinarily, where "the words of the statute are clear and unambiguous and . . . given their ordinary meaning . . . yield a workable and logical result, there is no need to resort to extrinsic aids in interpreting the statute." *Hashimi* v. *Kalil*, *supra* at 610. However, in view of the age of the 1906 act, the possibility of ambiguity in the term "requisition," and the city's argument that the statute is not workable unless the constraints of the appropriation process of the city are superimposed, we do not rely exclusively on the language of the statute.

2. When the 1906 act was passed, and throughout the history of the Commonwealth until the enactment of the Home Rule Amendment, which annulled art. 2 of the Amendments to the Constitution of the Commonwealth by the ratification in 1966 of art. 89 of the Amendments, a municipality had "only those power which [were] expressly conferred by statute or necessarily implied from those expressly conferred or from undoubted municipal rights or privileges."[9] *Bloom* v. *Worcester*, 363 Mass. at 157,

---

[9] The first paragraph of art. 2 of the Amendments to the Constitution of the Commonwealth formerly provided, in part: "The general court shall

quoting from *Atherton* v. *Selectmen of Bourne*, 337 Mass. 250, 255-256 (1958). See *Del Duca* v. *Town Admr. of Methuen*, 368 Mass. 1, 10 (1975). Under the law existing at that time, "a town [was] merely a subordinate agency of State government created for convenient administration." *Atherton* v. *Selectmen of Bourne*, *supra*, and cases cited. *Commonwealth* v. *Plaisted*, 148 Mass. 375, 384-387 (1889). Given this legal and constitutional framework in 1906, it is unlikely that the Legislature could have intended the 1906 act to subject the authority of the licensing board to the fiscal determinations of the mayor and city council. Any power of the mayor and city council to determine the amount of the licensing board's appropriations would have had to be explicitly stated. No such explicit grant of power appears in the 1906 act or in any subsequent amendment.[10]

3. In addition, there are clear indications that the 1906 act and its predecessor, St. 1885, c. 323, were passed with the intention of separating the authority of the licensing board from that of the mayor and city council of Boston. It is necessary to do some tracing here. Most of the duties given to the licensing board under the 1906 act were formerly handled for a time by the board of police of the city. *Welch* v. *O'Meara*, 195 Mass. 541, 543 (1907). St. 1885, c. 323, § 2. St. 1906, c. 291, § 4. The board of police was established by St. 1885, c. 323, § 1, to replace the board of police commissioners, which was created by St. 1878, c. 244,

---

have full power and authority to erect and constitute municipal or city governments, in any corporate town or towns in this commonwealth, and to grant to the inhabitants thereof such powers, privileges, and immunities, not repugnant to the constitution, as the general court shall deem necessary or expedient for the regulation and government thereof." See *Commonwealth* v. *Plaisted*, 148 Mass. 375, 386 (1889).

[10] The city does not argue that the Home Rule Amendment changes the effect or validity of the 1906 Act. Section 9 of the amendment provides in part: "All special laws relating to individual cities or towns shall remain in effect and have the force of an existing city or town charter, but shall be subject to amendment or repeal." See *Harrington* v. *Selectmen of Tisbury*, 369 Mass. 652, 654 (1976). See also *Opinion of the Justices*, 356 Mass. 761, 766-767 (1969).

§ 1. The 1878 act gave the board of police commissioners "the powers and duties conferred upon the board of license commissioners, appointed under the provisions of [St. 1875, c. 99, § 20]." St. 1878, c. 244, § 2.

Section 1 of the 1878 act empowered the mayor of Boston to appoint "three able and discreet persons to constitute a board of police commissioners in said city." Section 3 of that act stated, "The compensation of the commissioners and the officers of each grade shall be fixed from time to time by ordinances of the city council." Although there was no explicit provision for other expenses of the board, the 1878 act clearly made the board subject to the authority of the mayor and city council. Statute 1885, c. 323, § 1, took the appointing authority from the mayor and gave it to the Governor "with the advice and consent of the council." Section 4 specified the salaries of the board members, "which shall be paid monthly from the treasury of the city of Boston." This section also required the city to provide suitable facilities for the board and provided: "All expenses for the maintenance of buildings, the pay of the police and all incidental expenses incurred in the administration of the said police shall be paid by the city of Boston upon the requisition of said board."

While we do not place great weight on the preenactment statements of individual legislators in establishing legislative intent (see *Chrysler Corp.* v. *Brown*, 441 U.S. 281, 311 [1979]), in the circumstances of the development of the legislation in question the statements of a former mayor of Boston and of a Boston legislator pertaining to the bill which was the basis of the 1885 act shed light on the legislative intent in the enactment of St. 1885, c. 323. See *Symons* v. *Chrysler Corp. Loan Guar. Bd.*, 670 F.2d 238, 242-243 (D.C. Cir. 1981) (legislator's testimony is some evidence of Congress' views especially since the legislator was a primary supporter of the bill for many years and chaired the subcommittee that originally considered it). Cf. *Browne* v. *Turner*, 174 Mass. 150, 159 (1899); *Old South Assn.* v. *Boston*, 212 Mass. 299, 304-305 (1912); *Plunkett* v. *Old Col-*

*ony Trust Co.*, 233 Mass. 471, 474 (1919); *McKenney* v. *Commission on Judicial Conduct*, 377 Mass. 790, 799 (1979).

Augustus P. Martin, who had been the mayor of Boston in 1884, testified in favor of the bill, which became the 1885 act, before the Joint Committee of the Legislature on February 3, 1885. The mayor believed that "putting the police under the charge of the State" would "secure a better enforcement of the liquor law," would enable "the laws in relation to gambling [to] be more rigidly enforced," and provide "a better class of men to select from for appointments to the police force."[11] Testimony of Hon. Augustus P. Martin, Late Mayor of Boston, Before the Joint Committee of the Legislature 3, 4 (Press of Deland and Barta 1885). In a similar vein, but in stronger language, was the speech of Boston Representative Charles Carleton Coffin in the House of Representatives of the General Court on May 14, 1885.[12] Representative Coffin called the bill "the revolt of

---

[11] The former mayor went on to explain some of the reasons for his views:

"I am of the opinion that the police force has not maintained that same high character and integrity, in many particulars, that it did in former years. I attended the police ball, about a year ago, in an official capacity. It was held in the Institute building, on Huntington Avenue: and I must say here, as I told the commissioners, and told the police captains, that never in my life did I attend a more disgraceful assembly of people, either in this city or any other. It was as near a mob as anything I ever witnessed in my life. I saw men, waltzing with ladies upon the floor, with cigars in their mouths, smoking; women, with street costumes; and a pretty hard-looking set of people. I thought, if they were friends of the police department, there certainly needed to be some reformation somewhere. I think that is admitted on all sides. I was told by one captain, who went there himself with his family, that he never was so mortified in his life, and as soon as he could, properly and decently, he turned on his heal [*sic*], and went home. I never saw a policeman that I talked with, whether it was a captain, or lieutenant, or patrolman, but what was mortified with the exhibition at that ball. I understand that this year the ball was conducted upon entirely different principles, for the reason that the commissioners refused to grant them the right to hold a ball, unless it was managed on a different principle. Those are chiefly my reasons for believing that under a different management, or if the same commissioners derived their authority from a different source, they would be able to enforce discipline and order to a higher degree than they do at the present time."

[12] Representative Coffin was a member of the House of Representatives in 1884 and 1885. A biographer wrote of him: "It was through his active

the moral sense of the people of this city and of this com-
monwealth against the open, shameless, persistent, defiant
violation of law in this city."[13]    Speech of Mr. Charles
Carleton Coffin, of Boston, in the House of Representatives,
May 14, 1885.    Both men made clear their views that the
1885 bill was an attempt to have the police commissioners
"derive[ ] their authority from a different source."[14]
Testimony of Hon. Augustus P. Martin, *supra* at 5.    Speech
of Mr. Charles Carleton Coffin, *supra*.

The opinion in *Prince* v. *Boston*, 148 Mass. 285, 288-289
(1889), states the view that the "statute of 1885 transfers the
control, management, and direction of the police depart-
ment of Boston from the board of police commissioners ap-
pointed by the mayor and city council to the board of police
appointed by the Governor."    *Id.* at 288.    In that case, a
petition filed by ten taxable inhabitants of Boston sought an
injunction to prevent the city from paying the expenses of
the board upon its requisition.    *Id.* at 285, 286.    The court
said:    "We think it is competent for the city, until the act of
the Legislature is upon proper proceedings judicially
declared to be invalid, to appropriate money for the pur-
pose of paying [the board members'] expenses and the ex-
penses of the police department upon [the board members']
requisition."    *Id.* at 289.[15]

---

work while in the House of Representatives that two important measures
were successfully passed — the bill making all text-books free to the pupils
of the public schools, and the bill providing for the appointment of the
Boston police commissioners by the governor of the State, instead of by
the mayor of the city."    One of a Thousand 133 (J. Rand ed. 1890).

[13] The full content of Rep. Coffin's colorful speech would take us too far
from the precise issue before us.    Generally it discusses violations of law in
Boston and alcoholism.

[14] The Senate rejected an amendment to the 1885 bill which would have
made the 1885 act subject to the approval of a majority of voters of
Boston.    1885 Senate Journal, at 484-485.

[15] In *Commonwealth* v. *Plaisted*, 148 Mass. 375 (1889), the court, in re-
jecting the claim that the 1885 act was unconstitutional "because it takes
from the city the power of self-government in matters of internal police,"
*id.* at 383-384, stated, "The powers and duties of all the towns and cities,
except so far as they are specifically provided for in the Constitution, are

In light of this background, there can be little doubt that the Legislature intended the 1885 act to divest the city of all control and authority over the board of police and place it in the hands of the Governor. It would have been inconsistent with this intent to have left the city with any voice in determining the appropriations for the board. Control of the purse strings may well be the ultimate control. See note 3, *supra*. We think it clear that the Legislature intended the word "requisition" in the 1885 act to mean a demand for payment with which the city had to comply.

4. The 1906 act created the licensing board and a police commissioner and transferred certain of the duties formerly assigned to the board of police under the 1885 act to the licensing board and police commissioner. St. 1906, c. 291, §§ 4 & 10. See *Welch* v. *O'Meara*, 195 Mass. at 542-543. Additional duties, not of relevance here, were also given to the board and commissioner. Sections 4 & 8. The Governor retained the appointing power. Sections 1 & 7. The salaries of licensing board members and the police commissioner were set by the statute, and "shall be paid . . . by the city." Sections 2 & 8. The expenses of both the board and commissioner "shall be paid" by the city upon "requisition" of the board and commissioner. Sections 2, 3, 8 & 9. This requisition language is the same as contained in § 4 of the 1885 act. We conclude, therefore, that no change in the 1885 act was intended relative to the payment of expenses.[16]

___

created and defined by the Legislature, and we have no doubt that it has the right in its discretion to change the power and duties created by itself, and to vest such powers and duties in officers appointed by the Governor, if in its judgment the public good requires this, instead of leaving such officers to be elected by the people or appointed by the municipal authorities." *Id.* at 386-387. See also *Hibbard* v. *County of Suffolk*, 163 Mass. 34 (1895).

[16] In 1904 Senate Bill No. 5 and House Bill No. 909 it was provided that the board of police be appointed by the mayor. House Bill No. 141 provided that the board be elected by the voters of Boston. In 1905 House Bill No. 712, § 3, it was provided for a two-person board of license commissioners, one appointed by the mayor and one appointed by the Governor. Senate Bill No. 172 provided for a board of police appointed by the mayor subject to the approval of the Governor. None of these bills was approved by the Legislature.

This conclusion is supported by *Police Commr. of Boston* v. *Boston,* 239 Mass. 401 (1921). At issue there was § 8 of the 1906 act, which provided: "The city of Boston shall provide all such accommodations for the police of said city as said police commissioner may require. All buildings and property used by said police shall be under control of said police commissioner." The court said: "The responsibility in this particular rests wholly with the police commissioner. The city council have no voice whatever under St. 1906, c. 291, § 8, in deciding the ground area needed for the building. When the police commissioner has fixed the area of land which he deems necessary, that matter is set at rest. The only function of the city government is to provide a lot of at least that area." *Id.* at 409. The language of § 8 placing obligations upon the city to provide for the expenses and accommodations of the police commissioner is similar to that in §§ 2 and 3 pertaining to the licensing board.[17]

5. The city's contention that the outcome of this case is determined by St. 1909, c. 486, § 3, as amended, which provides in part that "[a]ll appropriations . . . shall originate with the mayor," has little merit. Section 5 of that act, as originally enacted and as appearing in St. 1936, c. 152, § 1, provided: "Nothing in this act shall authorize the abolition or the taking away of any of the powers or duties . . . of . . . any department in charge of an official or of-

---

[17] That there have been some instances where the Legislature has placed limitations on amounts which could be spent, and others where expenditures were made subject to the approval of the mayor and city council is also persuasive. See *Harris* v. *Wayland,* 16 Mass. App. Ct. 583, 586 (1983). For example, St. 1906, c. 291, § 9, limited the amount the police commissioner could requisition for legal expenses to $3,500 annually; St. 1909, c. 387, § 1, authorized the licensing board to lease quarters but limited the amount it could requisition for such purposes to $5,000; St. 1927, c. 76, provided that the secretary of the licensing board should be paid a salary not exceeding $3,500, subject to the approval of the mayor; and St. 1909, c. 486, § 20, provided that the Boston finance commission (established by the act with the members appointed by the Governor, with the advice and consent of the Council) could requisition for expenses in an amount not to exceed $25,000 annually "or such additional sums as may be appropriated for the purpose by the city council, and approved by the mayor."

ficials appointed by the governor." The next and most re-
cent amendment, St. 1953, c. 473, § 1, rewrote the section
which deals with city departments and agencies and pro-
vides: "[No] by-law or ordinance made under this section
[shall] affect in any way . . . any board or officer appointed
by the governor." This restriction pertains to powers
granted in "this section," whereas the former restriction
pertained to powers granted in "this act." There is nothing
in the 1953 amendment or in other amendments to the 1909
act which indicates a legislative intent to give to the city
more power over boards and officers appointed by the Gov-
ernor than was given it in the 1909 act. Without a clear in-
dication of intent to change the prior law, we assume that
the prior law remains in effect. See *Roberge's Case*, 330
Mass. 506, 509 (1953); *Ferullo's Case*, 331 Mass. 635, 637
(1954); *Town Crier, Inc.* v. *Chief of Police of Weston*, 361
Mass. 682, 686 (1972).

The city's reliance on *Police Commr. of Boston* v. *Boston*,
343 Mass. 480 (1962), is misplaced. In that case the court
held that the police commissioner of the city, despite the
provisions of St. 1906, c. 291, §§ 7 and 8, was subject to the
provisions of St. 1909, c. 486, § 30, with respect to the in-
vitation of bids by advertisement for contracts for work to
be performed in police buildings. The court noted: "[I]t is
difficult to see in what way the commissioner's authority is
circumscribed [by § 30]. All that is required by § 30 is that
the commissioner invite bids by advertisement in the City
Record. There is not even a requirement that the contract
be awarded to the lowest responsible bidder." *Id.* at
483-484 (citations omitted). There was no question raised
in the case as to the power of the commissioner to requisi-
tion payment (under St. 1906, c. 291, § 8) for contracts
properly awarded.

6. Whether the reasons for the 1885 act, the relevant
provisions of which were incorporated into the 1906 act, re-
main sound today, or whether other reasons support the
same approach, we cannot say.[18] Revision of special acts

---

[18] On June 21, 1981, the mayor sent to the city council for approval a
home rule petition which would make licensing board expenses subject to

such as here involved is for the Governor and the Legislature
under the Home Rule Amendment, or for initiation by the
city in accordance with the Home Rule Amendment and the
Home Rule Procedures Act (G. L. c. 43B).[19]

7. The city argues, weakly, that the "long standing prac-
tice" of the licensing board in following the city's budget
procedure (see note 2, *supra*) should be given weight in in-
terpreting the statutes in question. See *International Bhd.
of Elec. Wkrs.* v. *Western Mass. Elec. Co.*, 15 Mass. App.
Ct. 25, 28 (1982), and cases cited. There is nothing in the
record to indicate the practice during the first fifty years
under St. 1906, c. 291. The record is inconclusive as to
whether the city had formally adopted, since 1956, the posi-
tion that the licensing board was legally subject to the
budget and appropriation process, or whether that process
was followed and acquiesced in (if it was) as a result of prac-
tical considerations. In any event, our holding that St.
1906, c. 291, is plain and unambiguous precludes reliance
on any contrary interpretation by the city. *International
Bhd. of Elec. Wkrs., supra.*

---

appropriation by the mayor and council. There is nothing in the record
indicating the disposition of the petition. In his covering letter the mayor
said: "While legislation which required the City to pay all money requi-
sitioned by the Board may have been appropriate in 1906, when it was
enacted, it is no longer appropriate. The Licensing Board should bear its
share of the burden imposed upon the City by Proposition 2½ and school
overspending."

[19] In 1962 the Legislature changed the provisions of the 1906 act pertain-
ing to the police commissioner, providing for his appointment by the mayor
and making the police a department of the city, thereby subjecting it to the
budget and appropriation process. St. 1962, c. 322, § 1. No such changes
have been made in the 1906 act pertaining to the licensing board.

Prior to the passage of the Home Rule Amendment, in 1966, proposals
for altering the control over the licensing board had been considered by
the Legislature. For example, in 1954, House Bill No. 2754 was intro-
duced providing for the appointment of the members of the licensing
board by the mayor, and Senate Bill No. 768 provided for a special com-
mission to study the proposal. In 1960 House Bill No. 1569, §§ 1 and 2,
proposed making the appropriations to the licensing board subject to the
approval of the city council and the mayor. None of these bills was ap-
proved by the Legislature.

8.  The city argues that, at the very least, the licensing board may not spend more than the amount it requests from the mayor in its original requisition for the fiscal year.  That issue was not raised in the pleadings and was not the subject of the judge's order.  We do not consider it.  See S. *Kemble Fischer Realty Trust* v. *Board of Appeals of Concord,* 9 Mass. App. Ct. 477, 479-480, cert. denied sub nom.  *Costello* v. *Board of Appeals of Concord,* 449 U.S. 1011 (1980).  Moreover, we think that question is a matter for legislative concern.[20]

*Judgment affirmed.*

---

[20] We are not presented with the question whether the city may impose reasonable requirements on the submission of the licensing board's requisition for expenses in order that the city may fix its budget with reasonable certainty.  We do not suggest that such requirements would be improper.  We read the judgment language, "[s]uch requisition need not be submitted as part of a budget to the mayor," as meaning only that the licensing board is not subject to the budget and appropriation process.