CITY COUNCIL OF BOSTON[1] *vs.* MAYOR OF BOSTON & others.[2]

Suffolk.   May 12, 1987. — August 31, 1987.

Present: GREANEY, C.J., KASS, & WARNER, JJ.

*Statute,* Construction. *Municipal Corporations,* By-laws and ordinances, Mayor, City council, Reorganization of departments. *Boston.*

In a dispute between the mayor of Boston and the city council over reorganization of city agencies and departments, it was held that the phrase "[t]he city council with the approval of the mayor may . . . make by-laws or ordinances . . ." appearing in St. 1953, c. 473, § 1, qualified otherwise inconsistent language in St. 1951, c. 376, § 1, so that, with respect to reorganization of city departments, the mayor had absolute veto power over city council actions, with the result that c. 35, Ordinances of 1984, and c. 6, Ordinances of 1985, which had been disapproved by the mayor, were invalid. [669-670]

CIVIL ACTION commenced in the Superior Court Department on September 19, 1985.

The case was reported to the Appeals Court by *James J. Nixon,* J.

*Douglas A. Randall* (*Roger H. Randall* with him) for the plaintiff.

*Henry C. Luthin,* Assistant Corporation Counsel (*Albert W. Wallis,* Assistant Corporation Counsel, & *Stephen H. Clark,* Assistant Corporation Counsel, with him) for the defendants.

KASS, J. Upon report under Mass.R.Civ.P. 64, 365 Mass. 831 (1974), and stipulated facts, we are asked whether the mayor of Boston had absolute veto power in matters of reorganization of city agencies and departments. We conclude that he does.

---

[1] Twelve of thirteen members of the City Council have participated as plaintiffs in the action.

[2] The collector-treasurer, the auditor, and the building services commissioner of Boston and the city of Boston.

Examination of the plain words[3] of the pertinent statutory material has not been helpful; they point in quite contrary directions. Nor has the problem of interpretation been much advanced by recourse to the customary chestnuts of statutory construction, e.g., giving effect to all the statute's provisions, so that none will be superfluous,[4] effecting the legislative intent in view of the statute as a whole,[5] considering the mischief to be remedied and the object to be accomplished,[6] reading the statute so as not to defeat its utility,[7] and reading the statute so as to harmonize facially discordant portions.[8] Of course we keep these principles in mind, but the occasion calls more than ordinarily for scrutiny of the legislative history. In fair measure this is so because the source of governmental powers in Boston is a patchwork of special acts whose application requires consideration of their evolution. See *Boston Teachers Local 66* v. *Boston,* 382 Mass. 553, 563 (1981); *City Council of Boston* v. *Mayor of Boston,* 383 Mass. 716, 719-720 (1981); *City Council of Boston* v. *Boston,* 386 Mass. 171, 178-181 (1982).

The incidents which provoked the controversy before us involve two ordinances, one passed by the city council in 1984 and a second in 1985. An ordinance purporting to be c. 6, Ordinances of 1985, abolishes the inspectional services department[9] and establishes in its place a building department with inspection, engineering, zoning, enforcement and administration divisions, as well as an office of the ombudsman. In addi-

---

[3] See *Commonwealth* v. *Gove,* 366 Mass. 351, 354-355 (1974); *Hoffman* v. *Howmedica, Inc.,* 373 Mass. 32, 37 (1977); *Blue Cross of Mass., Inc.* v. *Commissioner of Ins.,* 397 Mass. 674, 678 (1986).

[4] *Devaney* v. *Watertown,* 13 Mass. App. Ct. 927, 928 (1982).

[5] *Pereira* v. *New England LNG Co.,* 364 Mass. 109, 115 (1973). *Tedford* v. *Massachusetts Housing Fin. Agency,* 390 Mass. 688, 696 (1984).

[6] *Newbury St. Associates* v. *Assessors of Boston,* 386 Mass. 513, 515 (1982); *O'Brien* v. *Director of the Div. of Employment Sec.,* 393 Mass. 482, 487-488 (1984).

[7] *Simon* v. *Solomon,* 385 Mass. 91, 100 (1982).

[8] *Boston* v. *Board of Educ.,* 392 Mass. 788, 792 (1984).

[9] Established under c. 19, Ordinances of 1981.

tion to other organizational revisions and innovations, there is an assertion by the city council of authority to dictate the rules and regulations by which the department shall be governed. That, apparently, is a major point of tenderness at the heart of this dispute between the two arms of the city government.

Chapter 35, Ordinances of 1984, establishes "within the mayor's office a division to be known as the Commission on Women." A similar ordinance was proposed by the mayor and rejected by the council. The difference between the mayor's and the council's versions is that the latter contains a reservation of authority by the council to rescind rules and regulations adopted by the newly-created commission.

In each instance the mayor vetoed the ordinance passed by the council, and the council thereafter adopted votes sufficient[10] to override the mayor's veto — *if* the council had the power to override. The mayor has refused to recognize the ordinances passed by the council as having any force, i.e., he has ignored them — hence this action for declaratory and injunctive relief by the council.

One of the conflicting statutes is St. 1909, c. 486, § 5, as appearing in St. 1953, c. 473, § 1, which provides that "[t]he city council *with the approval of the mayor* may from time to time make by-laws or ordinances . . . (a) to create a new department or agency; (b) to abolish, in whole or in part, any department or agency; (c) to reorganize, in whole or in part, any department or department head or any agency or agency head . . ." (emphasis supplied).[11] The plain words of this statute require mayoral approval of an ordinance touching on reorganization of city departments.

On the other hand, St. 1951, c. 376, § 17D, which deals generally with the enactment of ordinances in Boston, provides:

"Every order, ordinance, resolution and vote of the city council . . . shall be presented to the mayor for his

---

[10] Unanimously in the case of the commission on women and by eleven to two in the case of the inspectional services department.

[11] The remainder of § 5 deals with other transfers and adjustments in the executive structure, the appointment of department heads by the mayor without confirmation by the council, and other details not relevant to the case before us.

approval. If he approves it, he shall sign it; and thereupon it shall be in force. If he disapproves it, he shall, by filing it with the city clerk with his objections thereto in writing, return it to the city council which shall enter the objections at large on its records. Every order, ordinance, resolution and vote authorizing a loan or appropriating money or accepting a statute involving the expenditure of money, which is so returned to the city council, shall be void, and no further action shall be taken thereon; but the city council shall proceed forthwith to reconsider every other order, ordinance, resolution and vote so returned, and if, after such reconsideration, two thirds of all the city councillors vote to pass it notwithstanding the disapproval of the mayor, it shall then be in force. . . ."

It will be observed that § 17D gives the mayor a conclusive veto over loan authorizations, appropriations, and statutes involving the expenditure of money. Reading § 17D in isolation, therefore, the mayoral veto may be overriden as to any ordinance touching on other subjects.[12]

For purposes of the case before us, we may begin with the charter revision embodied in St. 1909, c. 486, much of which shapes the structure of Boston's government to the present day.[13] Under St. 1909, c. 486, § 4, the mayor received a conclusive veto over "[e]very appropriation, ordinance, order,

[12] For this reading, the inexhaustible canon of canons of statutory construction has a maxim: "[A] statutory expression of one thing is an implied exclusion of other things omitted from the statute." *Harborview Residents' Comm., Inc.* v. *Quincy Housing Authy.*, 368 Mass. 425, 432 (1975).

[13] A major charter revision had occurred in 1885. The 1909 act grew out of the report of a special commission which recommended the further fixing of political responsibility by changing from a bicameral to a unicameral legislature. There is in the report a repeating theme of strong executive power vested in the mayor, including a recommendation that the mayor have a concurrent voice in all matters passed on by the city council. The commission hoped its charter amendments would be "likely to secure good government when good men are elected, and to minimize the power of bad men, if elected, to provide bad government." See 1909 House Doc. No. 1311, 70-77. Visibility, the commission seemed to think, would encourage sound administration. The period was one when the Legislature was wont to look upon Boston politics with a leery eye. See *Boston Licensing Bd.* v. *Boston,* 17 Mass. App. Ct. 10, 17-19 & n.11 (1983).

resolution and vote" of the city council, except those relating to the council's internal affairs. Measures returned by the mayor with his objections were, in the language of § 4, "void." A charter commission in 1924 expressly rejected proposals to curtail the binding mayoral veto. 1924 House Doc. No. 1220. So things remained through the 1940's.

In 1947, a charter commission sat again.[14] That commission focused major attention on elections of the city council by proportional representation, coupled with appointment of a city manager by the council. Under that form of charter, dubbed Plan E, the mayor was a largely ceremonial figure elected by the council.[15] A majority of the commission recommended that the voters be offered alternative methods of electing a city council and that the city manager proposal be left to another day. 1947 Senate Doc. No. 530, at 8-13. The power relationship of the mayor and the council was not the subject of a recommendation.

The legislative upshot of the commission's report was St. 1948, c. 452, which provided the voters of Boston with three options: a Plan A charter, providing for plurality election of a mayor, nine-member city council, and five-member school committee; a Plan D charter, providing for plurality election of a city council, which would elect the mayor and appoint a city manager; and a Plan E charter. Each of the choices bore a distinct resemblance to the Plan A, D, and E forms available in c. 43, but was specially tailored to Boston. At the biennial municipal election in 1949, the voters of Boston adopted Plan A, a strong mayor charter. See *City Council of Boston* v. *Boston,* 386 Mass. at 178.

So far as the mayor's veto power was concerned, however, there was a certain clipping of the executive wings. We have seen that under St. 1909, c. 486, § 4, the mayor had the authority to veto every appropriation, ordinance, order, resolution and vote of the city council. Under the analogous provi-

---

[14] A charter commission sat in 1933 and reported in 1934.

[15] As to Plan E generally, see G. L. c. 43, §§ 93-116. Chapter 43 provides cities except Boston with a choice of six basic charters. G. L. c. 43, § 2.

sion in the Plan A statute adopted by the voters in 1949, St. 1948, c. 452, § 18A, the mayor's absolute veto power remains only as to loan authorizations, appropriations and statutes involving the expenditure of money.[16] *Boston Teachers Local 66* v. *Boston,* 382 Mass. at 563. In the case of other subject matter as to which the council might pass ordinances on its own initiative, the vote of two-thirds or more of the councillors could override the veto.

Reorganization of city departments was not adverted to in the Plan A provisions of St. 1948, c. 452. There remained intact § 5 of the 1909 charter (St. 1909, c. 486, § 5) which provided that "the mayor *and* city council at any time may by ordinance reorganize, consolidate, or abolish departments in whole or in part; . . . and establish new departments . . ." (emphasis supplied). Neither the council nor the mayor could act alone. Amendments to § 5 in 1919, 1928, 1934 and 1936 did not touch on this joint action requirement for reorganization of departments. See St. 1919, c. 222, § 1; St. 1928, c. 389; St. 1934, c. 227; St. 1936, c. 152.

The technical amendments to the charter adopted in 1949 added a § 17G which barred the city council from participation "in the conduct of the executive or administrative business of the city or county," a provision which buttressed the "strong mayor" character of the Boston charter provisions. St. 1951, c. 376, § 1. See *City Council of Boston* v. *Boston,* 386 Mass. at 179. In 1953, the Legislature, by St. 1953, c. 473, § 1, rewrote § 5 of the 1909 charter (the reorganization section) entirely. That act inserted the language quoted earlier in this opinion, viz., that "[t]he city council with the approval of the mayor may . . . make by-laws or ordinances . . ." relating to reorganization of city departments.

The amendment of the reorganization provision was submitted to the Legislature by the city's then mayor, John B. Hynes. The purpose of the amendment was to remove doubts as to

---

[16] Imperfections and ambiguities in the 1949 charter were noticed almost immediately. See 1951 Senate Doc. No. 610, at 5-9. Section 18A of St. 1948, c. 452, was amended by St. 1951, c. 376, § 1, and in the recodification affected by the 1951 act appears as § 17D.

the meaning of the word "department," see Communication from Mayor Hynes to the city council, dated August 3, 1953, concerning reorganization of city departments, and in other respects to adapt phraseology in the statute to the structure of government which existed in 1953. For example, the phrase, children's institution department, was dropped. It is hardly likely that a measure sponsored by the mayor was designed to enfeeble the mayor's powers.

We think that the substitution in 1953 of the phrase "[t]he city council with the approval of the mayor" qualifies the otherwise inconsistent language in St. 1951, c. 376, § 1, and means that the council and mayor must act together concerning reorganization of city departments as they were bound to do under the language of the 1909 charter. Although the word "approval" may have different meanings depending upon the context, *Springfield* v. *Commonwealth,* 349 Mass. 267, 271 (1965), in the context here presented, it has a connotation of some affirmative manifestation of favor by the mayor. See *McLean* v. *Mayor of Holyoke,* 216 Mass. 62, 65 (1913); *Simpson* v. *Marlborough,* 236 Mass. 210, 214 (1920). The organization of executive departments is intimately bound up with the mayor's managerial responsibilities. In light of the consistent emphasis in legislative commission reports and recent cases on the "strong mayor" nature of Boston's governmental structure, we are not disposed to conclude that there was legislative repeal by implication — in a fit of absence of mind — of the limits upon the city council, acting alone, to effect organizational changes in the executive branch of the municipal government. See *T. J. Hartnett Beverages Co.* v. *Alcoholic Beverages Control Commn.,* 350 Mass. 619, 622 (1966).

A judgment shall be entered that the ordinances passed by the city council which purport to abolish, create, and reorganize city departments or agencies, namely c. 35, Ordinances of 1984, and c. 6, Ordinances of 1985, are invalid and of no effect unless approved by the mayor. The mayor's disapproval

in this regard constitutes a veto which the city council cannot override.[17]

*So ordered.*

---

[17] On the view we take of the case it is not necessary to consider other issues raised by the parties.