In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-3408

RLJCS ENTERPRISES, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

PROFESSIONAL BENEFIT TRUST MULTIPLE EMPLOYER
WELFARE BENEFIT PLAN AND TRUST, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 03 C 6080—**John F. Grady**, *Judge*.

ARGUED APRIL 9, 2007—DECIDED MAY 2, 2007

Before EASTERBROOK, *Chief Judge*, and BAUER and
KANNE, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Professional Benefit Trust
offers death, health, severance, and other fringe benefits
to small corporations, many of them operated by physi-
cians. To fund the death benefits, the Trust takes out
insurance on the lives of participant employees. If an
employee dies, the Trust pays out the sum agreed with the
sponsoring employer, which may be more or less than the
death benefit under the insurance policy. Purchasing
insurance through a pool that covers hundreds of employ-
ers and owns thousands of policies has several benefits.

One is that joining a multi-employer welfare-benefit plan under ERISA enables employers to deduct contributions as business expenses while employees can defer taxation on the value of the fringe benefit. See 26 U.S.C. §419A(f)(6). Another is that the employees are assured of coverage even if a particular insurer should fail; all assets of the Trust stand behind every promised benefit. But the Trust cannot provide either the tax benefit or the risk-spreading service if each participant is treated as the owner of "his own" policy; the Trust must create a common fund that can be used for the benefit of all. The trust agreement sets up a Surplus Account for this purpose.

Plaintiffs are former participants in the Trust. On withdrawal, they were entitled to their pro rata share of the Trust's net asset value, excluding the Surplus Account. Once a participant employee withdraws, the Trust no longer has an insurable interest in his life, so it allows him to purchase that policy for its cash surrender value. Plaintiffs say that they are entitled to more—in particular, to distributions of stock attributable to "their" policies while they were owned by the Trust. In 1999 Canada Life Assurance Company converted from mutual to stock ownership. Sun Life Insurance Company of Canada did the same in 2000. Policy holders are the nominal owners of mutual insurance companies, and mutual insurers that change to ownership by equity investors offer stock to policyholders as part of the process; free or discounted stock cashes out the value of the policyholders' ownership interest in the insurer's buildings and other assets. The Trust, as the policies' owner, thus acquired stock in the reorganized Canada Life and Sun Life. Some of the stock has been retained; the rest has been sold in the market and the money reinvested.

What was the Trust to do with the proceeds of these transactions? After some initial uncertainty, the Trust decided to put them in its Surplus Account. It did this by

classifying the stock (and the net profit of any securities acquired and later sold) as "experience gains" under the trust agreement. It could have classified the stock as "dividends" on the policies; that, too, would have landed the stock in the Surplus Account. Assignment to the Surplus Account means that the assets with the Trust inure to the benefit of ongoing participants when any participant withdraws. In this suit under ERISA, plaintiffs contend that the stock (and any substitute assets) should have been distributed to them when they withdrew, on the theory that these elements of value are attached to each policy, which (plaintiffs maintain) each participant "really" owns individually, notwithstanding the terms of the trust agreement. Plaintiffs also contend that defendants have engaged in racketeering and are liable for treble damages under RICO, 18 U.S.C. §§ 1961-68. This attempt to smear the defendants as criminals draws into question the sincerity and accuracy of plaintiffs' other contentions. ERISA and trust law can be complex, and it does not help to accuse one's trading partner of mail fraud just because a disagreement requires judicial resolution.

One complication is that, during the years when Sun Life and Canada Life converted to investor ownership, the trust agreement did not define "experience gains." (A later amendment classifies the proceeds of demutualization as "experience gains," but the Trust does not contend that it applies to the conversions of Canada Life and Sun Life, if only because plaintiffs never assented to that amendment.) Nor does the plan expressly grant the Trustee discretion to resolve ambiguity. This means that the federal court might be required to make an independent decision. See *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). But this turns out to be unnecessary; the plaintiffs do not contest the Trust's understanding of "experience gains." They maintain, as we have said, that

each participant employee owns one insurance policy and therefore is entitled to receive that policy and all distributions attributable to it.

In making this argument plaintiffs rely on a Private Letter Ruling issued by the Internal Revenue Service in 2001. This ruling (PLR 200127047) concluded that the Trust (as it was organized in 1997) was an aggregation of welfare-benefit plans rather than a single plan and therefore did not entitle its participants to deductions under §419A(f)(6). (The Trust has since changed the terms of its governing documents in an attempt to protect the participants' tax benefits; the IRS has not yet said whether it views the changes as adequate.) The district court, however, concluded that the IRS's view of the tax consequences does not change the Trust's terms—which unambiguously make the Trust the owner of each life-insurance policy and entitle the Trust to control any value derived from the policy. That led the district court to grant summary judgment for the defendants. 438 F. Supp. 2d 903 (N.D. Ill. 2006).

The Trust does not buy and administer insurance policies on behalf of beneficiaries; it does so for its own security. The Trust contracts to pay a sponsoring employer (or a participant employee) a particular benefit. In this respect the Trust acts as an insurer. The Trust then secures its obligation and spreads risk by contracting with traditional insurance companies. The Third Plan Document, the governing instrument for these plaintiffs, makes this apparent:

> Each application for a policy, and the policies themselves, shall designate the Trustee as sole owner, with the right reserved to the Trustee to exercise any right or option contained in the policies, subject to the terms and provisions of this Agreement. The Trustee shall be the named beneficiary . . . . [§3.1]

> Subject to the right of a Participant Employee to make a Beneficiary designation (and change such designation from time to time) the Trustee shall have full and complete control over any insurance policy . . . . [§5.2(a)]
>
> [T]he Trustee is authorized and empowered . . . [t]o apply for and to own any life insurance policy of the Insurer held as an asset of the Trust Fund, and to exercise any option, privilege or benefit in connection therewith, including, without limitation, the right to collect and receive the cash surrender value proceeds and all dividends or other distributions thereof . . . . [§14.4(m)]
>
> The Employer shall have no right, title or interest in and to the contributions made by it to the Trust; and, no part of the Trust property, or *res,* nor any income attributable thereto, ever shall revert to the Employer or be used for, or be diverted to, purposes other than for the exclusive benefit of the Participant Employees or for the payment of taxes and expenses of administration of the Trust. No Participant Employee shall have any right, title or interest in and to any contributions to the Trust by the Employer, any portion of the Trust *res,* nor any portion of any income attributable to the Trust, except as may otherwise be provided herein. [§8.3]
>
> [N]o Participant Employee shall have any right, title or interest in any specific assets of the Trust Fund . . . . [§10.3(i)]

This language (and there is more in the same vein) shows that the Trust acts as insurer and buys policies to reinsure the risk; only the Trust has any property interest in any particular policy. It follows that distributions of cash or stock attributable to any policy also belong to the Trust.

What the employer and employee receive is the promised death benefit and, if they withdraw while the employee is still alive, a share of the Trust's net assets (except the Surplus Account)—but no entitlement to the fruits of any particular policy. The distributions on Sun Life and Canada Life policies no more belong to plaintiffs than they do to any other participants in the Trust. To see this, imagine that one of the plaintiff employers had contracted with Prudential for life insurance, and that Prudential had reinsured with Canada Life and received stock when Canada Life demutualized. No one would suppose that Prudential would have to hand over any of that stock if an insured decides to surrender his policy for its cash value before death occurs.

Plaintiffs lose if the trust agreement's language is enforced; they scarcely bother to contest this. Instead they contend that, because Tracy Sunderlage (the Trust's top manager) initially stated that the Trust would treat stock received in demutualization as attached to the policies, and available for distribution on withdrawal—and actually did distribute stock to a few withdrawing employers—the Trust is bound to honor that arrangement with them too.

Quite apart from ERISA, this argument would be a flop. One party's unilateral decision to give its contracting partner a benefit not required by the contract's terms (for example, a bank that excuses a customer's late payment) does not create any entitlement to future gifts. Conversions from mutual to stock form were novel; it took a while for the Trust to decide what to do, and it was not bound to give everyone the benefit of its initial missteps. Plaintiffs do not allege that they relied on Sunderlage's representations to their detriment; they were already participants in the Trust when Sun Life and Canada Life demutualized.

Paying out more to plaintiffs would leave less for other participants in the Trust. That's why ERISA forbids special deals between a multi-employer plan and any set of employers or participants. See, e.g., *Central States Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148 (7th Cir. 1989) (en banc). Plaintiffs cannot reach an understanding with Sunderlage that jeopardizes the interests of strangers. Even for single-firm pension or welfare plans, any participant's rights are set by the written document and may not be varied orally. See, e.g., *Frahm v. Equitable Life Assurance Society*, 137 F.3d 955 (7th Cir. 1998). This protects other participants (and sponsoring employers) from what may be mistaken or imprudent promises by the employees hired to administer the plans. Every participant gets his entitlement under the plan's terms, no less and no more; no participant is entitled to a windfall, no matter how earnestly one was promised and no matter how many mistaken payments the plan may have made before it finally got things right. Whatever room there may be for estoppel based on irreversible decisions taken as a result of incorrect advice—a subject on which, as we remarked in *Helfrich v. Carle Clinic Association, P.C.*, 328 F.3d 915, 918 (7th Cir. 2003), this court has not come to rest—does not assist plaintiffs, who do not contend that they took any irreversible step in reliance on bad advice from Sunderlage. Plaintiffs have their own lawyers and made their own decisions.

So far, we have not mentioned the lead argument in plaintiffs' brief: that the district court should not have excluded reports from three witnesses offered as experts. An accountant would have given his view of the demutualization process, and two lawyers proposed to opine on the meaning and effect of the IRS's private letter ruling. The district judge excluded these three reports because he thought that plaintiffs had missed the deadline for expert reports in discovery and, in any event, because

they conveyed legal rather than "expert" opinions. The latter reason is sufficient, see *Bammerlin v. Navistar International Transportation Corp.*, 30 F.3d 898, 901 (7th Cir. 1994), so we need not discuss the former.

Argument about the meaning of trust indentures, contracts, and mutual-to-stock conversions belongs in briefs, not in "experts' reports." Legal arguments are costly enough without being the subjects of "experts'" depositions and extensive debates in discovery, in addition to presentations made directly to the judge. If specialized knowledge about tax or demutualization would assist the judge, the holders of that knowledge can help counsel write the briefs and present oral argument. In this court each side is represented by two law firms, and a professor of law also has signed plaintiffs' brief. Enough!

Not that the reports' exclusion made any difference. All of them started from the premise that the participants "really" owned the insurance policies, and that's the core issue in the case. It had to be addressed, not assumed away. In the accountant's view, stock received in demutualization should not be treated as an "experience gain" because it is not a "gain" of any kind. A policy's premium goes in part to pay for insurance and in part to pay for "ownership"; when the ownership rights are split from the insurance in demutualization, the stock should be retained by the policy's owner so that an interest already paid for through premiums is not lost. That may be so as an economic matter—but it overlooks the fact that the Trust, not the participant, paid the premiums of the policy. Participating employers buy a promise of a death benefit to be paid by the Trust; it is the Trust that chooses where and how to reinsure, and that pays for the protection. So if the stock belongs to whoever paid the premium and owns the policy, then it belongs to the Trust rather than the employer or the participant employee.

Finally, the litigants have debated at length the significance of *Chicago Truck Drivers Health & Welfare Fund v. Teamsters Local 710*, 2005 U.S. Dist. LEXIS 42877 (N.D. Ill. Mar. 4, 2005), which discusses the handling of stock received in demutualization. It is a pointless debate. The Teamsters' plans have terms different from those of the Professional Benefit Trust. What's more, decisions of district judges have no authoritative effect. See, e.g., *Old Republic Ins. Co. v. Chuhak & Tecson, P.C.*, 84 F.3d 998, 1003 (7th Cir. 1996); *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1124 (7th Cir. 1987). District judges' opinions often contain persuasive observations, but these can be incorporated into the parties' briefs. It is never helpful to have an lengthy exchange on what a particular district court's opinion "really means" and whether that case was correctly decided. The parties should learn what the opinion has to teach and weave its wisdom into their own presentations.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*