**VERTEX SURGICAL, INC.,**
Plaintiff/Appellant,

v.

**PARADIGM BIODEVICES, INC.,**
Defendant/Appellee.

Civil Action No. 07–10134–DPW.
First Circuit No. 09–1934.

United States District Court,
D. Massachusetts.

Aug. 31, 2009.

Thomas E. Kenney, Robert R. Pierce, Pierce & Mandell, PC, Boston, MA, for Defendant/Appellee.

Barbara H. Kramer, Kramer & Kramer, LLP, Ann Arbor, MI, Mitchell A. Kramer,

Kramer & Kramer LLP, Rydal, PA, L. Seth Stadfeld, Weston Patrick Willard & Redding, PA, Boston, MA, for Plaintiff/Appellant.

### MEMORANDUM AND ORDER

DOUGLAS P. WOODLOCK, District Judge.

The parties, after vigorously litigating this matter to final judgment through summary judgment practice and a jury trial, report that they can settle the case, but apparently find this Court's prior determination of one claim inconvenient to their agreement. Shortly before the deadline for filing a notice of appeal, they jointly moved pursuant to Fed.R.Civ.P. 60(b) "for an order vacating the portion of the court's January 9, 2009 Memorandum and Order, 648 F.Supp.2d 184 (D.Mass.2009) dismissing Plaintiff's claims against Defendants pursuant to the Georgia Wholesale Distribution Act, specifically Part III.B of the Memorandum and Order."

The parties report they "have agreed that, if the Court grants the instant motion, Plaintiffs will not file [or now further pursue][1] an appeal in this matter, and each party will bear its own costs relating to the trial." The parties' submission neglects directly to address their request for relief in light of U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship, 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994), where the Supreme Court held, in the context of orders for vacatur sought in appellate courts, that only "exceptional circumstances may conceivably counsel in fa-

---

1. I have been informed by settlement counsel for the Civil Appeals Management Program of the United States Court of Appeals for the First Circuit that the parties, despite the filing of a notice of appeal, continue to seek this relief. Given the filing of the notice of appeal vesting jurisdiction of this case in the Court of Appeals, I will treat their Rule 60(b) motion in accordance with the protocol recognized in

Commonwealth of Puerto Rico v. The S.S. Zoe Colocotroni, 601 F.2d 39, 42 (1st Cir.1979). Under that protocol, I may address parties' Joint Motion for Relief from Judgment in a fashion designed to permit the parties and the Court of Appeals to take into consideration disposition of the motion in this Court in connection with further appellate proceedings.

vor of such a course." *Id.* at 29, 115 S.Ct. 386. The Court further emphasized that "exceptional circumstances do not include the mere fact that the settlement agreement provides for vacatur." *Id.* I find nothing exceptional in the parties' settlement that would justify vacating a portion of the prior judgment I have entered and consequently will deny the joint motion.

## I.

*Bonner Mall* sought to resolve the tension which exists when litigants seek and receive a formal public act—a judicial decision—and then agree that the court's act is unnecessary to compose the private disputes between them. While *Bonner Mall* was pending in the Supreme Court, Professor Resnik, in a characteristically thoughtful and provocative essay, explored the questions that *Bonner Mall* and similar vacatur cases raise:

> What value should be accorded adjudication? What limits, if any, should there be on courts' encouragement and facilitation of settlement? Who owns lawsuits, the risks they entail and the decisions generated in their wake? What do the words "public" and "private" mean in the context of court decisions? How should one balance litigants' autonomy and third party interests in litigation?

Judith Resnik, *Whose Judgment? Vacating Judgments, Preferences for Settlement, and the Role of Adjudication at the Close of the Twentieth Century,* 41 U.C.L.A. L.Rev. 1471, 1472 (1994).

*Bonner Mall* offered an answer to certain of these questions by creating a default rule against vacatur as a result simply of settlement. With a settlement, the Court observed, "the losing party has voluntarily forfeited his legal remedy by the ordinary processes of appeal or certiorari, thereby surrendering his claim to the equitable remedy of vacatur." 513 U.S. at 25, 115 S.Ct. 386.

In crafting this default rule, the Supreme Court was not oblivious to the prospect that "facilitation of settlement" might have "resulting economies for the federal courts." *Id.* at 27, 115 S.Ct. 386. The Court observed that

> while the availability for vacatur may facilitate settlement after the judgment under review has been rendered and certiorari granted (or appeal filed), it may *deter* settlement at an earlier state. *Some* litigants, at least, may think it worthwhile to roll the dice rather than settle in the district courts, or in the court of appeals, if, but only if, an unfavorable outcome can be washed away by a settlement-related vacatur. And the judicial economies achieved by settlement at the district-court level are ordinarily much more extensive than those achieved by settlement on appeal.

*Id.* at 27–28, 115 S.Ct. 386 (emphasis in original).

Ultimately, however, the Court declined to weigh this policy argument in the balance. "We find it quite impossible to assess the effect of our holding, either way, upon the frequency or systemic value of settlement." *Id.* at 28, 115 S.Ct. 386.

Although *Bonner Mall* concerned vacatur at the appellate level, the Supreme Court was careful to adopt a familiar standard: that of "exceptional circumstances" (sometimes phrased as "extraordinary circumstances"), *id.* at 29, 115 S.Ct. 386, the standard that governs Fed.R.Civ.P. 60(b)(6). *See, e.g., Gonzalez v. Crosby,* 545 U.S. 524, 535, 125 S.Ct. 2641, 162 L.Ed.2d 480 (2005) (noting the "extraordinary circumstances" required to justify reopening a final judgment under Fed.R.Civ.P. 60(b)(6)); *United States v. 6 Fox Street,* 480 F.3d 38, 45–46 (1st Cir.2007) (describing the "exceptional circumstances" or "extraordinary circumstances" necessary to invoke Fed.R.Civ.P. 60(b)(6)); *Ahmed v.*

*Rosenblatt,* 118 F.3d 886, 891 (1st Cir. 1997) ("exceptional circumstances justifying extraordinary relief" required). In this connection, the Court suggested that

> even in the absence of, or before considering the existence of, extraordinary circumstances, a court of appeals presented with a request for vacatur of a district-court judgment may remand the case with instructions that the district court consider the request, which it may do pursuant to Federal Rule of Civil Procedure 60(b).

*Bonner Mall,* 513 U.S. at 29, 115 S.Ct. 386. This suggestion that recourse be made to Fed.R.Civ.P. 60(b) effectively establishes the standard for consideration by a district court as whether a request for vacatur arises as a result of exceptional or extraordinary circumstances.

## II.

The motion for vacatur relief the parties seek here must be understood in the context of the travel of the case to final judgment. The plaintiff Vertex Surgical, Inc., a Georgia corporation which sells medical equipment as a sales representative, brought this action on January 25, 2007 seeking lost commissions following termination of the Independent Agent Agreement it entered into with the defendant Paradigm Biodevices, Inc., a Massachusetts manufacturer and distributor of surgical products. The Agreement provided that "Massachusetts law exclusively shall govern all terms" and that "all disputes in any way relating" to the Agreement "must be litigated in courts sitting in Massachusetts." The plaintiff's complaint alleged three counts: breach of contract (Count I); violation of the Georgia Wholesale Distribution Act (Count II); and violation of the Massachusetts Consumer and Business Protection Act, Mass. Gen. Laws ch. 93A (Count III).

Following substantial completion of discovery, the plaintiff moved for partial summary judgment as to the breach of contract claim and the Georgia Wholesale Distribution Act claim. In a Memorandum and Order dated January 9, 2009, I denied summary judgment to the plaintiff, (a) finding genuine issues of material fact as to Count I, the breach of contract count, *Vertex Surgical, Inc. v. Paradigm Biodevices, Inc.,* 648 F.Supp.2d 184, at 186–90 (D.Mass.2009), and (b) concluding specifically that the parties' contractual choice of law provision barred Count II's invocation of the Georgia Wholesale Distribution Act. Consequently, I granted summary judgment on Count II to the defendant. *Id.* at 189–92.

Count I was tried to a jury in May and the jury, finding no actionable breach, returned a verdict in favor of the defendant. Meanwhile, I found as factfinder no violation of the Chapter 93A claim asserted in Count III.

On the basis of the jury's factfinding as to Count I, my grant of summary judgment on Count II and my factfinding as to Count III, judgment was entered for the defendant on May 29, 2009. The parties filed the joint Rule 60(b) motion on June 15, 2009; eleven days later the plaintiff filed its Notice of Appeal vesting jurisdiction of the case in the Court of Appeals.

I was advised on August 14, 2009 in an email from the First Circuit's Settlement Counsel that he learned during the course of mediating the case that "[t]he parties have settled all of their claims and have also agreed that if you vacate your ruling insofar as the claim based on the Georgia Act is concerned, their claims will be voluntarily dismissed by Vertex." He further advised that "[u]nless you are inclined to allow the joint motion, I am informed that the appeal will go forward."

## III.

The parties offer no argument on the merits why my choice of law ruling on the

Georgia Wholesale Distribution Act is in error. Rather, they elliptically advance contentions that (A) the substance of the ruling is so insignificant that it may be discarded without cost and (B) that the practice of vacatur upon settlement is adequate grounds for such a disposition.

(A)

 The principal substantive contention in support of the motion to vacate is that "[b]ecause the application of Massachusetts' choice-of-law analysis has been and continues to be developed by Massachusetts state courts, the grant of Rule 60(b) relief will not deprive the public of judicial precedent." This purported concern with the precedential effect of a federal district court decision regarding a state law matter requires some analytical unbundling.[2]

 The judgments of nisi prius courts generally are not precedential as that term is conventionally understood. Such decisions are binding only on the parties under principles of res judicata and even the nisi prius judge who authored them is not otherwise obligated, except in service of a seemly consistency, to follow them in later cases. As Judges Posner and Easterbrook have repeatedly and accurately observed, with characteristic bluntness, district court decisions are neither authoritative nor precedential. *See, e.g., RLJCS Enters., Inc. v. Prof'l Benefit Trust Multiple Employer Welfare Benefit Plan*, 487 F.3d 494, 499 (7th Cir.2007) ("Decisions by district judges have no authoritative effect.") (Easterbrook, C.J.); *Old Republic Ins. Co. v. Chuhak & Tecson, P.C.*, 84 F.3d 998, 1003 (7th Cir.1996) ("Decisions by district judges do not have the force of precedent....") (Posner, C.J.); *Mueller v. Reich*, 54 F.3d 438, 441 (7th Cir.1995) ("District court decisions are not authority as precedents, even at the district court level.") (Posner, C.J.). District court decisions, Chief Judge Posner has observed, "by themselves ... cannot clearly establish the law because, while they bind the parties by virtue of res judicata, they are not authoritative as precedent and therefore do not establish the duties of nonparties." *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir.1995). Authoritative precedent for use by all nisi prius courts—federal and state—is generated by appellate courts.[3]

 Res judicata, of course, is a concern presented by any unvacated judg-

---

**2.** It bears noting that only one Massachusetts court, the Supreme Judicial Court, may definitively prescribe binding rules of decision on matters of Massachusetts law. This is true not only for state courts but also for federal courts sitting in diversity. As the First Circuit has recently reiterated, a federal court, in applying state law, must look to the pronouncements of the Supreme Judicial Court, as the highest court in Massachusetts. *Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co.*, 547 F.3d 48, 51 (1st Cir.2008). If the SJC has not spoken to the precise issue, "the federal court must make an informed prophecy as to the state court's likely stance." *Id.* Although lower state court decisions may provide guidance to the federal court, and are entitled to some weight, the decisions of those courts are not binding. *Id.* at 55. Federal courts sitting in diversity therefore play a role

similar to that of the lower state courts in the articulation and application of state law on issues not directly and authoritatively addressed by the SJC.

**3.** More particularly, unless and until the Supreme Judicial Court has addressed a pertinent state law issue, a federal district court is bound by First Circuit precedent. *Esquire, Inc. v. Esquire Slipper Mfg. Co.*, 243 F.2d 540, 544 (1st Cir.1957) (holding that "in the absence of clear mandatory words, we shall continue, until the Supreme Judicial Court of Massachusetts gives clear indication to the contrary, to construe the statute" as construed in prior First Circuit jurisprudence); *Winter Panel Corp. v. Reichhold Chems., Inc.*, 823 F.Supp. 963, 969 (D.Mass.1993) (finding that "until the Supreme Judicial Court or the Court of Appeals for the First Circuit has occasion to reexamine the issue," the federal

ment, and that is true in every case settled after final judgment has entered. Under the plain teaching of *Bonner Mall*, nothing in settlement alone would appear to supply the exceptional or extraordinary circumstances necessary to justify relieving the parties from the res judicata consequences of the judgment entered. To be sure, although the parties do not offer any argument or information on the matter in the absence of vacatur, my disposition of the Georgia Wholesale Distribution Act claim may conceivably have some collateral effect in other litigation in which the plaintiff may be involved.[4]

The dismissal of claims by Vertex following upon the requested vacation of so much of the January 9, 2009 Memorandum and Order as disposed adversely of plaintiff's claim in Count II would presumably deprive the holding of the finality necessary for collateral estoppel against the plaintiff. This is presumably a matter of some concern to the plaintiff as a Georgia business within the protection of the Georgia Wholesale Distribution Act. But any future collateral estoppel effects appear rather marginal; my disposition was grounded narrowly on Massachusetts choice of law principles and not on any general interpretation of the Georgia Wholesale Distribution Act itself. This holding would presumably be a material concern only if the plaintiff has entered into other contracts with enforceable provisions choosing to have Massachusetts law govern. No doubt the plaintiff hopes, should the occasion arise, to find a more sympathetic court to rule in the future on Massachusetts choice of law principles without confronting the analysis I offered in my January 9, 2009 Memorandum and Order.

district court will be bound by the prevailing First Circuit case). Federal courts faced with a determinative legal issue that is close or difficult, where no controlling Supreme Judicial Court precedent exists and policy issues of general applicability are implicated, may certify questions to the Supreme Judicial Court. *See generally In re Engage, Inc.*, 544 F.3d 50 (1st Cir.2008). For their part, Massachusetts state trial courts are obligated to follow the law of the Massachusetts Appeals Court until the Supreme Judicial Court has ruled on the issue. *See Boston Licensing Bd. v. City of Boston*, 17 Mass.App.Ct. 10, 455 N.E.2d 469, 477 (1983) (ruling that the Appeals Court's interpretation of a statute in a prior case precluded reliance on any contrary interpretation of the statute).

4. Under federal principles of collateral estoppel, which govern the preclusive effect of a decision made by a federal district court sitting in diversity, *Lynch v. Merrell–National Labs.*, 830 F.2d 1190, 1192 (1st Cir.1987), a party will be barred from pursuing an issue in future litigation if it has had a "full and fair opportunity" to litigate the issue in a prior case. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326–28, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Blonder–Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). The essential requirements of collateral estoppel are that both proceedings involve the same issue of law or fact, the issue was actually litigated by the parties in the first case, the first court resolved the issue in a "final and binding judgment," and the court's resolution of the issue was essential to its judgment. *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 978 (1st Cir. 1995). Massachusetts res judicata law is similar. A party that has received an adverse decision on an issue, after a "full and fair opportunity to litigate," will be barred from pursuing the issue in future litigation under principles of collateral estoppel. *Pierce v. Morrison Mahoney LLP*, 452 Mass. 718, 897 N.E.2d 562, 572 (2008) (quoting *In re Goldstone*, 445 Mass. 551, 839 N.E.2d 825, 832 (2005)). The doctrine of collateral estoppel applies when the issue is "actually litigated" and resolved "by a valid and final judgment." *Commonwealth v. Rodriguez*, 443 Mass. 707, 823 N.E.2d 1256, 1260 (2005) (quoting *Cousineau v. Laramee*, 388 Mass. 859, 448 N.E.2d 756, 759 n. 4 (1983)); *see also Bar Counsel v. Bd. of Bar Overseers*, 420 Mass. 6, 647 N.E.2d 1182, 1184 (1995); *Miles v. Aetna Cas. & Sur. Co.*, 412 Mass. 424, 589 N.E.2d 314, 316–17 (1992).

■ In any event, if the judgment is, as I have determined, supportable on the merits—and the plaintiff has offered nothing to justify reconsideration—I am not inclined to vacate it. In the absence of concern by the parties with the integrity of a final judgment entered after fully developed litigation in the trial court, it falls to the court which has issued the judgment to insure that the legal principles crystallized and given voice in a reasoned opinion are not silenced, at least until displaced by the judgment of a competent court of superior jurisdiction.

Embedded in the parties' suggestion that development of the choice of law principles I applied falls to other courts and consequently that "Rule 60(b) relief will not deprive the public of judicial precedent," appears to be the implicit contention that the social value of the January 9, 2009 opinion in this case is minimal because the case ultimately turned on an unpublished analysis of a fact-specific contract. To be sure, case law, not cited by the parties, can be found to support such a view of "unpublished" opinions in federal cases resolving questions of state law. *See C & H Sugar Co. v. Solstice Indus., Inc.*, No. 05–74265, 2007 WL 2870991, at *1 (E.D.Mich. Sept. 27, 2007) (holding that the social value of precedent was minimal where an order being vacated was an unpublished decision based on state law). Quite apart from failing fairly to acknowledge the social value of considered judgments generally, this contention evidences a not unusual failure

to understand the significance of book publication[5] of district court opinions.

■ As I have noted, district court opinions are neither precedential nor authoritative. Chief Judge Esterbrook has instructed appellate counsel that

> [d]istrict judges' opinions often contain persuasive observations, but these can be incorporated into the parties' briefs. It is never helpful to have a lengthy exchange on what a particular district court's opinion "really means" and whether that case was correctly decided. The parties should learn what the opinion has to teach and weave its wisdom into their own presentations.

*RLJCS Enters.*, 487 F.3d at 499. District court opinions are fundamentally fact intensive and designed for two principal audiences—the parties and the appellate court in the case at issue, neither of whom require publication in the bound volumes of F.Supp.2d to access the analysis for purposes of evaluating its persuasiveness.

■ As one commentator has accurately observed, "trial judges work under an understood, though generally unarticulated, standard pursuant to which the question of whether to write an opinion in connection with any given controversy lies squarely within a judge's discretion." Chad M. Oldfather, *Writing, Cognition, and the Nature of the Judicial Function*, 96 Geo. L.J. 1283, 1289 (2008); *see generally id.* at 1289–92.[6] In this setting, the decision whether to prepare a written

---

5. The term "unpublished" is often used to designate judicial opinions not published in the West Reporter series. But publication, in the sense of more general circulation of judicial opinions than simply to the parties, may occur by distribution through other formal and informal channels. For purposes of this opinion, I will refer to publication in the West Reporter system as "book publication." Conversely, the term "unpublished" will be treated as meaning not the subject of book publication.

6. Professor Oldfather addresses the differing approaches to judicial writing between trial and appellate courts but finds that

> [t]he existence of differing expectations and practices regarding judicial writing at the two levels of the judicial hierarchy ought not to trouble us, for the courts involved have differing functions. Viewed as a whole, the judiciary serves two primary purposes: First, to provide a peaceful mechanism for the resolution of disputes; and second, to generate and clarify legal

opinion for book publication is a matter of very broad and unreviewed discretion. Consequently, it is not surprising that attitudes by district judges regarding book publication are highly personal and differ widely. Some judges are accused of never entertaining a thought they wouldn't be inclined to submit for publication in any bound volume that will accept it. Others rarely submit their opinions for book publication. But book publication is no reliable proxy for, or even a clue to, the social value of the judgments judicial opinions embody.

Book publication by district judges is largely carried out by means of what one of my colleagues observed is referred to as the judges' "vanity press," *Presentation of Portrait of Hon. William G. Young*, 505 F.Supp.2d XLV, LVII (D.Mass.2006) (remarks of Young, J.), administered by West Publishing, which has published more or less contemporaneously in serial bound volumes a collection of federal court decisions for the past 129 years through its Federal Reporter series. It will come as no surprise that West is remarkably accommodating in its willingness to publish in book form virtually any reasoned opinion submitted to it by a federal judge. The incentive system is not difficult to understand. More pages of opinions mean more books sold to subscribers. But to the degree that the "social value" of the opinion enters into the publication calculus, it depends upon the discretion, the attitudes, and the practices of the individual district judge making the decision whether to submit an opinion for book publication.[7]

standards applicable to present and future disputes. But responsibility for these larger systemic functions is not allocated evenly amongst the judiciary's tiers. In the typical conception of the American judicial system, trial courts primarily serve the first function, while appellate courts primarily serve the second. Chad M. Oldfather, *Writing, Cognition, and the Nature of the Judicial Function*, 96 GEO. L.J. 1283, 1289 (2008) (citations omitted). Given these differences in function, the continuing controversy surrounding unpublished appellate decisions, Aaron S. Bayer, *Unpublished Appellate Decisions Are Still Commonplace*, THE NATIONAL LAW JOURNAL, Aug. 24, 2009, at 14, is not directly applicable to expectations and practices in the trial courts.

7. Beginning as of January 2, 2002, the Clerk's Office of this Court stopped mailing paper copies of opinions judges of the District of Massachusetts designated for publication to legal publishers such as West and instead posted all opinions-both those designated by the judicial officer for publication by legal publishers and opinions not designated for such publication-on the Court's external web page. While West Publishing appears to access from the Court's website and publish in the bound volumes of the West Reporter series all opinions designated for publication on this Court's opinion page, West appears also to include even those posted opinions not designated for publication in its Westlaw database. In any event, all opinions of this Court, whether the subject of book publication or not, have been generally available through electronic legal publishing mechanisms for nearly a decade. Indeed, this has become a matter of statutory mandate. About a year after this Court established its own internet opinion page, Congress enacted the E–Government Act of 2002, Pub.L. No. 107–347, requiring that all federal courts establish and maintain a website that provides "[a]ccess to the substance of all written opinions issued by the court, regardless of whether such opinions are to be published in the official court reporter...." *Id.* § 205(a)(5). The Judicial Conference of the United States has defined a "written opinion" under § 205(a)(5) as "any document issued by a judge or judges of the court, sitting in that capacity, that sets forth a reasoned explanation for a court's decision." Accordingly, all reasoned explanations of judicial decisions of federal courts are required to be accessible electronically irrespective of whether they are designated for book publication.

Even before the advent of the internet age, West would at the instance of interested parties inquire of a judge who had not designated a particular opinion for book publication whether the judge would be willing to allow

As a matter of policy, throughout my tenure on the bench, I have maintained an austere approach toward the submission of opinions to West for publication in the Reporter series. It has seemed to me that the bookshelves of the nation's law libraries now groan under the burden of published opinions by first instance courts.[8] When opinions are necessarily and appropriately fact intensive, without precedential or authoritative effect and largely repetitive of established legal doctrine, book publication seems supererogatory. While I generally write opinions—often at great length—to resolve dispositive motions in order to assure the parties (and myself) that their contentions have been considered and to afford the Court of Appeals a full understanding of the grounds for my decisions, I submit opinions to West for book publication in the Reporter series only rarely, usually when some genuinely new approach of general application is evident or the case has occasioned some broad public commentary. And even these principles I do not treat expansively. I am of the view that what a trial judge does to advance the state of the law is interstitial; among judges generally, trial judges are particularly "confined from molar to molecular motions." *S. Pac. Co. v. Jensen*, 244 U.S. 205, 221, 37 S.Ct. 524, 61 L.Ed. 1086 (1917) (Holmes, J., dissenting). The larger work of a trial judge does not become visible to the otherwise disinterested human eye until gathered with other similar efforts into the patterns fabricated in appellate courts as authoritative precedent. But a trial court opinion is not less significant for being one of the individual building blocks from which the overall edifice of the law is constructed. Without extending these reflections, it should be sufficient to observe that an opinion by me not published in a bound volume of the West Reporter series hardly suggests my implicit view that the decision I have rendered has negligible social value.

Moreover, the arrival of the internet age has, as Dean Levi, a former United States District Judge, recently observed, made the concept of an unpublished opinion—in the sense of an opinion not published in a book, *see* Note 5 *supra*—a "misnomer." David F. Levi, *Autocrat of the Armchair*, 58 DUKE L.J. 1791, 1802 (2009).

> Before electronic publishing, an unpublished opinion was truly unpublished; the court did not send the opinion to West or other publishers and it was usually available only to the parties in the litigation in slip form or in the file maintained at the courthouse. These opinions were not citable because they were not generally available, and to permit citation would give unfair advantage to institutional repeat litigants who

West to publish it in the Reporter series. It was my practice to agree to such requests. Moreover, publication of opinions not designated by judges for book publication occurred—and continues to occur—extensively in book publications for speciality fields of the law such as the bankruptcy, labor, patent, securities and tax areas.

8. I once offered demonstrative evidence of this phenomenon by suggesting during a court ceremony that one way to understand the increase in book publication by federal judges was to look at the bookshelves behind the bench in certain of the Boston Federal Courthouse's courtrooms. I observed that three rows of bookshelves in my own courtroom, Courtroom 1, hold

> all of the published opinions of all of the nation's lower federal courts—District and Circuit—from 1789 to 1880, together with all of the Massachusetts Supreme Judicial Court opinions from 1804 to 1933, and there's some room left over. The shelves behind us here [in Courtroom 22] hold only the decisions of the nation's United States District Judges from about September 1998, when we entered this building until March 2002, not even four years.

*Presentation of Portraits of Hon. John Lowell and Congressman John Joseph Moakley*, 425

would have their own collections of these cases. But with the advent of electronic research and with the requirement that court filings be available on public court websites, it makes no sense to consider these opinions unavailable or unpublished. They are easily obtainable and they appear in any electronic search.[9]

*Id.*

The suggestion in the joint motion that, as a substantive matter, "the grant of Rule 60(b) relief will not deprive the public of judicial precedent" is both accurate and beside the point. As I have explained, neither my January 9, 2009 Memorandum and Order nor any opinion of a federal district court is precedent in the classic sense. But such an opinion does offer a fully considered judicial analysis rendered with finality regarding a ripe dispute between adverse parties. In the internet age, it is the obligation of the United States District Court for the District of Massachusetts to make that opinion, as with every other reasoned explanation for a court's decision, accessible to the general public electronically, irrespective of whether it is designated for book publication.

Vacating a portion of that opinion deprives the public of the full measure of a reasoned public act. As a substantive matter, that is not an insignificant cost imposed by the relief the parties seek.

### (B)

■ The parties' principal procedural contention is that their inchoate settlement, for which they say vacatur of the judgment is a necessary condition, creates greater efficiency in dispute resolution. In assessing this basis, I begin with the obvious observation that this is presumably true of every settlement in the sense that settlements save the parties the costs and risks of further litigation while affording certainty and finality regarding recovery. Settlements conserve judicial resources as well. That, however, is hardly exceptional. The joint motion ultimately relies upon what the parties characterize as "the public policy of encouraging the settlement of private disputes." In this they identify with a very strong trend among the judiciary, explored by Professor Resnik and others, to view settlement as the preferred mode of disposition for litigation.[10] But *Bonner Mall* was handed down by a Su-

---

F.Supp.2d XVI, XVIII (D.Mass.2005) (remarks of Woodlock, J.).

9. By the same token electronic data bases like Westlaw are apparently also willing to "depublish" opinions if requested to do so by the court in connection with vacatur, so that such opinions no longer appear in their databases. Recently, for example, a settlement was reached following appellate argument but before appellate decision in a case where a $24 million tort verdict was returned against two railroads; as part of settlement the trial judge "agreed to vacate eight of his published opinions and to 'direct' Lexis and Westlaw to remove them from their databases." Shannon P. Duffy, *After Settlement in Amtrak Case, Opinions Erased from Lexis and Westlaw*, Legal Intelligencer, Aug. 19, 2009, *available at* www.law.com/jsp/article.jsp?id= 1202433145853. A Westlaw spokeswoman said the "request to remove the opinions would 'absolutely' be honored, and that any instance in which a judge vacates a published

opinion automatically leads to its withdrawal from Westlaw's database." *Id.*

10. *See generally* Judith Resnik, *Whither and Whether Adjudication?*, 86 B.U. L.Rev. 1101, 1123–38 (2006) (describing the "wilting of adjudication" that has resulted from the promotion of private outcomes through mediation and negotiation over litigation disputes); Jeffrey Parness, *American General Jurisdiction Trial Courts: New Visions, New Guidelines*, 55 U. Kan. L.Rev. 189 (2006) (discussing the relationship between procedural reform and trial judges' role in resolving cases outside litigation); Mark Galanter, *The Vanishing Trial: An Examination of Trials and Related Matters in Federal and State Courts*, 1 J. Empirical Legal Studies 459 (2004) (tracing the numerical decline in the number of cases that are resolved at trial); Judith Resnik, *Managerial Judges*, 96 Harv. L.Rev. 374 (1982) (providing the watershed analysis of the trial judge's expanding role in encouraging settlement).

preme Court fully cognizant of this trend and that decision represents a choice nevertheless to make the dissolution of final judgments available to the settlement enterprise only in exceptional or extraordinary circumstances.

Given the strong trend—indeed public policy—of encouraging settlements, it is not surprising that there has been a certain amount of backsliding since *Bonner Mall* in which trial courts, facing heavy caseload pressures, have sought to lend their encouragement to settlements by specious constructions of the requirement that the circumstances for doing so must be "exceptional," to support the vacation of a final judgment. *See, e.g., Freedom Wireless, Inc. v. Boston Commc'ns Group, Inc.,* No. 00–12234, 2006 WL 4451477, at *1–2 (D.Mass. Oct. 11, 2006) ("If the global settlement is not consummated ... [consequences] could result in a significant loss of Massachusetts jobs.... Global settlement of several complex, multi-party lawsuits will conserve this Court's and the parties' time, money and other resources.... By enabling the settlement of these actions, this Court would avoid further protracted litigation in the Federal Circuit and in this Court."); *Clever Devices, Ltd. v. Digital Recorders, Inc.,* No. 3:03–cv–679–M, 2004 WL 1265934, at *12 n. 3 (N.D.Tex. June 3, 2004) ("[I]f the further pendency of the case in the district court would expend a massive quantity of resources, the Court's interest in conserving its own judicial resources and the par-

ties' interest in conserving their resources could constitute 'exceptional circumstances'...."); *Novell, Inc. v. Network Trade Center, Inc.,* 187 F.R.D. 657, 661–62 (D.Utah 1999) ("[S]ettlement would be in the best interest of both parties.... [V]acatur outweighs any harm the federal judicial system may suffer from losing legal precedent.... [T]he copyright issue would be left open to be decided another day in future litigation.").[11]

Certain Courts of Appeals, which face caseload pressures no less daunting than those faced by trial courts, have been similarly willing to honor *Bonner Mall* in the breach in order to enable settlement.[12] The practice of the Second Circuit, where the technique of judgment vacatur appears to have its roots and initially flowered,[13] is illustrative. That court has variously and indulgently authorized vacatur on the basis of "exceptional circumstances" when it has had questions about the holding of the district court, *Microsoft Corp. v. Bristol Tech., Inc.,* 250 F.3d 152, 152–55 (2d Cir. 2001); where "vacatur of the district court's order and opinion was a necessary condition of settlement," *Major League Baseball Props. v. Pac. Trading Cards, Inc.,* 150 F.3d 149, 151 (2d Cir.1998); and where, if an order of sanction against an attorney—which the court viewed as collateral to the underlying judgment and likely in error—"were removed then the way to a settlement would be clear." *Keller v. Mobil Oil Corp.,* 55 F.3d 94, 98 (2d Cir.1995).

---

**11.** Commentators both pre- and post-*Bonner Mall* have noted the negative consequences from such an indulgent approach to vacatur requests. *See generally* Judith Resnik, *Mediating Preferences: Litigant Preferences for Process and Judicial Preferences for Settlement,* 2002 J. DISP. RESOL. 155; Daniel Purcell, Comment, *The Public Right to Precedent: A Theory and Rejection of Vacatur,* 85 CAL. L.REV. 867 (1997); Jill E. Fisch, *Rewriting History: The Propriety of Eradicating Prior Decisional Law*

*Through Settlement and Vacatur,* 76 CORNELL L.REV. 589 (1991).

**12.** *See generally* Kathleen Scanlon, *A Case for Judicial Accountability: When Courts Add a Settlement Detour on the Traditional Appellate "Path,"* 17 OHIO ST. J. ON DISP. RESOL. 379 (2002) (addressing the issues created by appellate mediation programs and settlement-related vacatur case law).

**13.** *See Fisch,* Note 11 *supra,* at 602–04.

Adopting a more measured approach, the First Circuit has carefully described "a primary concern" of *Bonner Mall* as "whether the appellant deliberately mooted the appeal," *Kerkhof v. MCI World-Com, Inc.*, 282 F.3d 44, 53 (1st Cir.2002), and conducted its analysis accordingly. That, of course, is precisely this case. Other First Circuit cases have recognized prudential and equitable circumstances favoring vacatur of *interlocutory* relief upon settlement when, for example, the decision is fraught with complex federalism concerns, *Wal–Mart Stores, Inc. v. Rodriguez*, 322 F.3d 747, 750 (1st Cir.2003); and where the court itself during oral argument encouraged a "temporary stay ... comparable to that ordered by the district court if the district court decision—establishing what the IRS sees as dangerous precedent—were vacated." *Motta v. Dist. Dir. of I.N.S.*, 61 F.3d 117, 118 (1st. Cir. 1995). No such prudential or equitable circumstances are present in this case.

The case law has expressed concern for the interest of "repeat players" as influencing the "exceptional circumstances" analysis. *See, e.g., Rodriguez*, 322 F.3d at 750; *Major League Baseball Props.*, 150 F.3d at 152; *Motta*, 61 F.3d at 118. But the First Circuit has been clear that the "repeat player" factor is cabined by "the concerns expressed by the *Bancorp* Court

about giving parties undue control over judicial precedents." *Motta*, 61 F.3d at 118.[14] Nevertheless, the case law has evidenced a special solicitude for protecting the rights of claimants to intellectual property who may seek to pursue more congenial litigation venues. *See, e.g., Major League Baseball Props.*, 150 F.3d at 152 ("[T]he validity of MLB's marks would be left to future litigation."); *Freedom Wireless, Inc.*, 2006 WL 4451477, at *2 (patent litigation); *Novell*, 187 F.R.D. at 661–62 ("[T]he copyright issue would be left open to be decided another day in future litigation.").

It is not immediately obvious, however, why "repeat players" or those concerned with trademarks, patents, and copyrights who anticipate "future litigation" should be entitled to special consideration. A policy of special consideration for such litigants entitles them to make multiple claims on the resources of the courts over the same essential dispute, a result which is hardly conducive to judicial efficiency over the long run. Indeed, the doctrine of collateral estoppel was framed in *Blonder–Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), precisely to limit repeat players, like patent holders, to a single bite of the apple if they are one-time losers on a relevant issue. As the *Blonder–Tongue* Court ob-

---

**14.** The principal repeat players in the federal courts, federal government agencies, have more than adequate opportunities, without resort to questionable vacatur gambits, for multiple litigation of issues to advance particular views on statutory or constitutional interpretation. For instance, federal agencies have developed nonacquiesence policies, whereby the agency instructs its employees to follow an agency position regarding governing law, rather than an adverse circuit court decision, while the agency relitigates the issue in other circuits in order to challenge circuit case law with which it disagrees. *Rosendo–Ramirez v. I.N.S.*, 32 F.3d 1085, 1093–94 (7th Cir.1994); *Hyatt v. Heckler*, 807 F.2d 376, 379 (4th Cir.1986); *Stieberger v. Bowen*, 801 F.2d 29, 33 (2d Cir.1986). *See also* Samuel Estreicher and Richard Revesz, *Nonacquiescence by Federal Administrative Agencies*, 98 YALE L.J. 679, 713–14 (1989); Steven P. Eichel, *Respectful Disagreement: Nonacquiescence by Federal Administrative Agencies in United States Court of Appeals Precedents*, 18 COLUM. J.L. & SOC. PROBS. 463, 490–501 (1985). Federal government lawyers have historically conducted litigation strategy programs involving test cases in multiple circuits. *See generally* PETER H. IRONS, THE NEW DEAL LAWYERS (1st ed.1982) (discussing the litigation strategy of government lawyers pressing for the judiciary's acceptance of New Deal legislation).

served, "[i]n any lawsuit where a defendant, because of the mutuality principle, is forced to present a complete defense on the merits to a claim which the plaintiff has fully litigated and lost in a prior action, there is an arguable misallocation of resources." *Id.* at 329, 91 S.Ct. 1434; *see also Walsh v. Int'l Longshoremen's Ass'n,* 630 F.2d 864, 868 (1st Cir.1980) (observing that collateral estoppel not only minimizes the likelihood of inconsistent decisions, but also "conserves judicial resources") (quoting *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)).

Given the current zeitgeist of "managerial judging" and its implementation through aggressive judicial pursuit of settlements, it is always an alluring prospect to dispose of a case by the expedient of enabling settlement rather than by the hard work of actually exercising judgment. And no doubt individual judges offered the prospect of such settlements by "repeat players," who likely will engage in any repetition before other courts or judges, find short-term judicial efficiencies—narrowly and personally perceived—in vacation of an inconvenient judgment. But *Bonner Mall,* fairly read, stands as an impediment to such a disposition in the absence of true, as opposed to pretextual, "exceptional circumstances." No doubt "[b]y nature, circumstances that are 'exceptional' elude ... limits or classification." *Microsoft,* 250 F.3d at 155. Perhaps future case law faithful to the teaching of *Bonner Mall* will more particularly delineate its limits and refine the relevant classifications. In any event, the inchoate

settlement in this case lies at the heartland of *Bonner Mall's* procedural concerns. At the instance of the appellant the parties here seek to discard a holding integral to the final judgment for no reason other than to effectuate a plain vanilla settlement. There is nothing exceptional in such a circumstance and I will decline to provide Rule 60(b)(6) relief to the parties.

### (C)

Having neither been presented with nor found any basis in the teachings of *Bonner Mall* to treat the circumstance of the parties' inchoate settlement as either exceptional or extraordinary, I will deny the parties' Joint Motion for Relief from Judgment. In accordance with the protocol recognized in *Commonwealth of Puerto Rico v. The S.S. Zoe Colocotroni,* 601 F.2d 39, 42 (1st Cir.1979), *see* Note 1 *supra,* this denial may itself be appealed and the Court of Appeals may "entertain a request to consolidate that appeal with the pending appeal from final judgment." *Id.*

### IV.

While my denial of the parties' joint motion rests upon the Supreme Court's holding and direction in *Bonner Mall,* I recognize that a decision under Rule 60(b)(6) involves the exercise of broad discretion. *Valley Citizens for a Safe Env't v. Aldridge,* 969 F.2d 1315, 1317 (1st Cir. 1992). Consequently, I feel obligated to offer additional personal observations regarding the perspective which guides my exercise of that discretion. I have come to view [15] a motion for vacatur of a fully

---

**15.** In the early stages of my tenure on the bench, in several instances under a practice I came to regret even before *Bonner Mall* effectively proscribed it, I was prepared to enable settlements by vacating judgments and fully considered decisions supporting them, whether unpublished or published. *See, e.g., Allstate Ins. Co. v. Quinn Constr. Co.,* 713

F.Supp. 35 (D.Mass.1989) (opinion granting summary judgment for plaintiff), *vacated by* 784 F.Supp. 927 (D.Mass.1990) (dismissing case with prejudice and vacating opinion granting summary judgment for plaintiff).

As Justice Jackson once observed in retreating from a former position, Baron Bramwell

considered and developed judicial opinion upon which a final judgment rests—for no grounds other than it has subsequently become by their agreement inconvenient for the parties—to be an invitation to the courts to join Orwell's protagonist, Winston Smith, in the work of the Ministry of Truth. *See generally* GEORGE ORWELL, 1984 (Plume—Harcourt Brace 2003) (1950). Winston's job was "to rectify" original judgments by making them agree with later recalculations; he did so by fabricating corrections and then "crumpled up the original message and any notes that he himself had made, and dropped them into the memory hole to be devoured by the flames." *Id.* at 39–40. In this process of substitution and destruction, no "expression of opinion, which conflicted with the needs of the moment, [was] ever allowed to remain on record. All history was a palimpsest, scraped clean and reinscribed exactly as often as was necessary." *Id.* at 41.

■ Whatever may be the proper response prior to entry of final judgment or to circumstances which can fairly be termed exceptional, when a subsequent settlement is the only basis offered to vacate a final judgment, the offer should be rejected as an inappropriate effort to treat judicial history as mere palimpsest. Irrespective of whether an opinion is authoritative and precedential beyond application of principles of res judicata, and despite the fact that a fully reasoned opinion was not submitted for distribution through the bound volumes of the vanity press, a judicial decision rendered with finality should be addressed on the merits and then discarded only if unpersuasive on the merits. No expedient of deposit in a memory hole should substitute for honest and clear-eyed confrontation with pertinent past judgments.

At the risk of introducing yet another, perhaps overwrought, literary allusion to this personal discussion, I have come to believe the only proper answer to requests for vacatur in the absence of truly exceptional circumstances is that given by the widowed Lady Anne to the request of Richard, Duke of Gloucester as he stood by the corpse of her father-in-law, Henry VI, whom Gloucester had killed, as he had her husband, Prince Edward. "Say that I slew them not," Richard implored. "Then say they were not slain: But dead they are," she replied. WILLIAM SHAKESPEARE, RICHARD THE THIRD act 1, sc.2, 89–91.[16]

---

extricated himself from a somewhat similar embarrassment by saying, "The matter does not appear to me now as it appears to have appeared to me then." *Andrews v. Styrap*, 26 L.T.R. (N.S.) 704, 706. And Mr. Justice Story, accounting for his contradiction of his own former opinion, quite properly put the matter: "My own error, however, can furnish no ground for its being adopted by this Court...." *United States v. Gooding*, 12 Wheat. 460, 478, 6 L.Ed. 693. Perhaps Dr. Johnson really went to the heart of the matter when he explained a blunder in his dictionary—"Ignorance, sir, ignorance." But an escape less self-depreciating was taken by Lord Westbury, who, it is said, rebuffed a barrister's reliance upon an earlier opinion of his Lordship: "I can only say that I am amazed that a man of my intelligence should have been guilty of giving such an opinion." If there are other ways of gracefully and good-naturedly surrendering former views to a better considered position, I invoke them all.
*McGrath v. Kristensen*, 340 U.S. 162, 177–78, 71 S.Ct. 224, 95 L.Ed. 173 (1950) (Jackson, J., dissenting).

**16.** I recognize the risk of this allusion appearing overwrought is enhanced because Lady Anne's response was most famously deployed in a legal setting by Justice Jackson as the final observation to his closing address during the principal Nuremberg Trial. ROBERT H. JACKSON, THE NÜRENBERG CASE AS PRESENTED BY ROBERT H. JACKSON, CHIEF COUNSEL FOR THE UNITED STATES (Alfred A. Knopf 1947).

Rather than vacate my prior determination disposing of the plaintiff's Georgia Wholesale Distribution Act claim by application of Massachusetts choice of law principles, I choose to leave the January 9, 2009 Memorandum and Order where it stands for others to make of it what they will.[17] If the Court of Appeals chooses to resurrect the Georgia Wholesale Distribution Act claim it will presumably do so on the merits. But a decent respect for a dispositive judgment requires that the fact it has been issued with finality, after full consideration of the contentions the parties have advanced, should not be ignored.

## V.

The "Joint Motion Requesting Withdrawal of Dismissal of Plaintiff's Claim Under Georgia Wholesale Distribution Act" (Dkt. No. 60) filed in this Court in the case now pending on appeal before the United States Court of Appeals for the First Circuit as Docket Number 09–1934 is hereby DENIED.

---

17. Given the nature of this discussion, I will also designate both the instant Memorandum and Order and the January 9, 2009 Memorandum and Order to West for publication in a volume of F.Supp.2d.